[No. B177111. Second Dist., Div. Eight. June 22, 2005.]

ALBERTO PINERO, Plaintiff and Appellant, v.
SPECIALTY RESTAURANTS CORPORATION, Defendant and
Respondent.

**COUNSEL**

Law Offices of Robert S. Scuderi and Robert S. Scuderi for Plaintiff and Appellant.

Snell & Wilmer, Richard A. Derevan and Marc L. Turman for Defendant and Respondent.

**OPINION**

**BOLAND, J.**—Appellant Alberto Pinero sued his former employer, respondent Specialty Restaurants Corporation (SRC), for retaliation. Pinero claimed that SRC forced him to resign after learning Pinero had filed an age discrimination action against another former employer, who also was a city council member in a city where SRC conducted business. Following the presentation of Pinero's case-in-chief at trial, SRC moved for nonsuit when Pinero rested. The trial court found Pinero did not establish he was subjected to any form of adverse employment action, and granted the motion. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 1998, SRC hired Pinero as general manager of Luminarias, a restaurant in Monterey Park. When he was hired, Pinero was a plaintiff in a pending age discrimination action against Alfred Balderrama, his former

employer and a member of the Monterey Park City Council. Pinero did not inform SRC about his lawsuit against Balderrama.

In January 1999, Pinero was transferred and promoted to general manager of the Castaways Restaurant in Burbank, SRC's "flagship" restaurant in Southern California, and a larger facility than Luminarias. Pinero's immediate supervisor at both Luminarias and Castaways was SRC's regional manager Hoss Babaie. Babaie's supervisor was John Tallichet, SRC's vice-president of operations.

In late April or early May 1999, John Tallichet's father, SRC's president and chief executive officer, David Tallichet, learned about Pinero's lawsuit against Balderrama. David Tallichet met or spoke with Pinero several times to persuade Pinero to abandon or settle what he believed was a frivolous lawsuit against Balderrama. Pinero repeatedly told Tallichet the lawsuit was a private matter and was of no concern to SRC. On May 18, 1999, a meeting was conducted at David Tallichet's office and was attended by Pinero, Pinero's attorney, David and John Tallichet, and two SRC attorneys. At the meeting, an SRC attorney told Pinero his lawsuit against Balderrama was frivolous and should be dismissed. The attorney also told Pinero he had concealed information from SRC when he was hired and would be fired for having done so. The meeting ended after Pinero repeated the lawsuit had nothing to do with SRC.

After the meeting, Pinero claims Babaie began to repeatedly criticize him about one work-related matter or another. Notwithstanding the criticism, Pinero was not fired, demoted or transferred, did not lose any benefits, bonuses or commissions, did not suffer any wage reduction, and did not experience any change in job duties or responsibilities between the time of his transfer to Castaways and his departure from SRC's employ. By mid-August 1999, Pinero concluded he could no longer handle the situation and resigned.

Pinero filed this employment action against SRC. He claims SRC retaliated against him in violation of the Fair Employment and Housing Act, Government Code section 12940, subdivision (h) (FEHA), for initiating the lawfully protected activity of filing an age discrimination action against Balderrama.

A jury trial was conducted. After Pinero presented his case-in-chief and rested, SRC moved for nonsuit. (Code Civ. Proc., § 581c.) SRC argued Pinero failed to prove he had suffered any substantial or material alteration in the terms and conditions of his employment in retaliation for engaging in a

protected activity. The motion was granted and judgment was entered in favor of SRC. This appeal followed.[1]

## DISCUSSION

Pinero contends the trial court's nonsuit was erroneous because he presented sufficient evidence to support a jury verdict in his favor on his statutory claim of retaliation in violation of FEHA. For reasons discussed below, we conclude Pinero is mistaken.

1. *The standard of review.*

We independently review the ruling on a motion for nonsuit, guided by the same rules that govern the trial court. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656]; *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541–1542 [50 Cal.Rptr.2d 395].) "We will not sustain the judgment ' " 'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " ' " (*Ewing v. Northridge Hospital Medical Center* (2004) 120 Cal.App.4th 1289, 1296 [16 Cal.Rptr.3d 591].) However, "[a] mere 'scintilla of evidence,' does not create a conflict for the jury's resolution; 'there must be substantial evidence to create the necessary conflict.' (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 410, p. 413, italics [omitted].)" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

2. *Pinero failed to present evidence he suffered an "adverse employment action."*

To establish a prima facie case of retaliation in violation of FEHA, a plaintiff must show he engaged in a protected activity, his employer subjected him to an adverse employment action, and a causal link exists between his protected activity and the employer's action. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 814–815 [89 Cal.Rptr.2d 505].) Without question, Pinero's filing of an age discrimination action against Balderrama under FEHA qualifies as a "protected activity."

---

[1] In a prior appeal of this case, we partially reversed an order sustaining without leave to amend SRC's demurrer to Pinero's second amended complaint. We concluded Pinero had stated, or could amend his pleading to state, viable claims for retaliation and constructive discharge in violation of public policy. On remand, Pinero alleged both causes of action. However, the common law public policy claim was dismissed by the trial court after Pinero abandoned allegations of bribery and extortion. Only the statutory retaliation claim remains at issue in this appeal in which we review the evidence not merely the pleadings.

The question before us is whether the evidence supports Pinero's claim that he suffered one or more "adverse employment actions" at the hands of SRC. FEHA itself does not define "adverse employment action," and only three published cases have explored the meaning of the phrase. (*McRae v. Department of Corrections* (2005) 127 Cal.App.4th 779, 787–790 [25 Cal.Rptr.3d 911] (*McRae*); *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441 [116 Cal.Rptr.2d 602] (*Akers*); and *Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507 [91 Cal.Rptr.2d 770] (*Thomas*).) However, a number of federal courts have considered the issue when construing analogous federal antidiscrimination statutes, and have divided into three groups.[2]

The first group has taken the most restrictive view, holding that an adverse employment action is limited to ultimate employment decisions, such as firing, demotion or reduction in pay. (See *Mattern v. Eastman Kodak Co.* (5th Cir. 1997) 104 F.3d 702, 707–708; *Ledergerber v. Stangler* (8th Cir. 1997) 122 F.3d 1142, 1144.)

The second group takes a broader view of "adverse employment action," and includes a wide range of intermediate employment decisions, so long as the decision or action materially and detrimentally affected the terms and conditions of a plaintiff's employment. (See, e.g., *Von Gunten v. Maryland* (4th Cir. 2001) 243 F.3d 858, 866, fn. 4; *Brown v. Brody* (D.C. Cir. 1999) 339 U.S. App.D.C. 233 [199 F.3d 446, 457]; *Hollins v. Atlantic Co., Inc.* (6th Cir. 1999) 188 F.3d 652, 662; *Torres v. Pisano* (2d Cir. 1997) 116 F.3d 625, 640.)

The third group, which includes Ninth Circuit decisions, has adopted the "deterrence test" promulgated by the Equal Opportunity Employment Commission (EEOC). (See, e.g., *Ray v. Henderson* (9th Cir. 2000) 217 F.3d 1234, 1243 (*Ray*).)[3] Under the deterrence test, an adverse employment action is " 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.' " (*Ray*, at pp. 1242–1243, citing EEOC Compliance Manual Section 8 (1998) Retaliation, ¶ 8008.) Proponents of this test argue that clever supervisors and employers may just as effectively succeed in "chilling" an employee's protected activity by engaging in actions which may be deemed retaliatory, even though no one action alters the express terms or parameters of an

---

[2] When California authority on the subject is sparse, our Supreme Court has deemed it appropriate to look to federal precedent analyzing analogous statutes, given the similarity between state and federal employment discrimination claims. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

[3] Our Supreme Court has granted review in a fourth case, *Yanowitz v. L'Oreal USA, Inc.* (Cal.App.) (*Yanowitz*), which adopted the Ninth Circuit's deterrence test.

employee's job description. (See *Knox v. State of Ind.* (7th Cir. 1996) 93 F.3d 1327, 1334 ["The law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit"].)

With respect to the view that "adverse employment actions" are limited to ultimate employment decisions, every California court which has considered the issue has rejected such a restrictive view, and we agree. (See *Akers, supra,* 95 Cal.App.4th at p. 1455; *Thomas, supra,* 77 Cal.App.4th at p. 511; cf. *McRae, supra,* 127 Cal.App.4th at p. 790.) In addition, with the exception of the now depublished *Yanowitz,* no California court has adopted the EEOC's "deterrence test." Only the *McRae* court considered applying the EEOC rule, and it specifically rejected such a test. It concluded its application (1) could be used to "support a finding of adverse employment action in nearly any employment action or decision," and (2) improperly collapsed two independent elements of a prima facie retaliation claim, making it inconsistent with the standard *McDonnell Douglas* test. (*McRae, supra,* 127 Cal.App.4th at p. 789; see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 [36 L.Ed.2d 668, 93 S.Ct. 1817].)

■ Instead, courts considering the question of what constitutes an adverse employment action for purposes of a statutory retaliation claim have uniformly held an intermediate retaliatory employment action may suffice: "The legislative purpose underlying FEHA's prohibition against retaliation is to prevent employers from deterring employees from asserting good faith discrimination complaints, and the use of intermediate retaliatory actions may certainly have this effect." (*Akers, supra,* 95 Cal.App.4th at p. 1455; see also *Thomas, supra,* 77 Cal.App.4th at p. 511; *McRae, supra,* 127 Cal.App.4th at pp. 789–790.) However, courts also have been united in the view that an employer's intermediate decision or action "constitutes actionable retaliation only if it had a substantial and material adverse effect on the terms and conditions of the plaintiff's employment." (*Akers, supra,* 95 Cal.App.4th at p. 1455; see *Thomas, supra,* 77 Cal.App.4th at pp. 511–512 [analyzing plaintiff's "complaints of adverse employment actions to determine if they result[ed] in a material change in the terms of her employment"]; *McRae, supra,* 127 Cal.App.4th at p. 789 ["adverse employment action means an employment action that causes substantial and tangible harm, such as, but not limited to, a material change in the terms and conditions of employment"].)

In this case, we need not try to determine whether the Supreme Court will endorse the "materiality" test adopted by the majority of appellate courts, or the less stringent "deterrence" test applied in *Yanowitz.* Even under the latter test, the employment actions about which Pinero complains are insufficiently adverse to support a retaliation claim: "[O]nly non-trivial employment actions

that would deter reasonable employees from complaining about [discrimination] will constitute actionable retaliation," even under the EEOC rule. (*Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 928.) Proponents of each test agree that the purpose of FEHA was not to remedy "any possible slight resulting from the filing of a discrimination complaint." (*Akers, supra,* 95 Cal.App.4th at p. 1455; see also *Thomas, supra,* 77 Cal.App.4th at p. 511 [noting that employer's action must be quite disruptive, because " '[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action' "].) In short, neither the materiality nor the deterrence test grants an employee license to litigate his displeasure or trivial grievances with an employer's work-related criticisms. That is precisely what occurred here.

The following evidence, viewed in the light most favorable to Pinero, was presented in his case-in-chief: David Tallichet met with Alfred Balderrama regarding SRC's desire to obtain a lease extension from the City of Monterey Park for the Luminarias facility. The next day, Balderrama called Tallichet and told him about Pinero's age discrimination action. Tallichet believed the lawsuit was "frivolous" and, as a favor to Balderrama, tried to persuade Pinero to dismiss the action. Tallichet does not recall telling Pinero it was unwise to sue a council member of a city with which SRC does business, but does not believe it is a good idea to sue a council member who is also your landlord. Tallichet, who left the May 18, 1999 meeting at his office early, was not aware anyone at SRC ever threatened to fire Pinero unless he dismissed his lawsuit against Balderrama.

John Tallichet testified he and Hoss Babaie jointly decided to promote Pinero to general manager of Castaways. At the time, Pinero was SRC's most qualified general manager in Southern California. They felt Pinero was capable of managing Castaways and doing an excellent job, even though the new position would require him to manage a facility whose volume of business was three times that of Luminarias. Pinero had worked for SRC, on and off, for years, and had served at Luminarias for 15 months. SRC had no complaints about Pinero's performance. Indeed, Pinero's performance was so exemplary he received a special bonus in February 1999 for his work during the previous fiscal year. This was the only bonus John Tallichet ever gave to an employee.

John Tallichet testified he began receiving complaints from Babaie about Pinero's performance a few months after Pinero's transfer to Castaways, although he could not recall any specific complaint. In April 1999, SRC's regional controller conducted a quarterly unit control inspection of Castaways. The inspection revealed deficiencies in several areas, which were

detailed in an April 27, 1999 report. On May 6, 1999, Tallichet sent Pinero a memorandum noting he was "very disturbed" by the inspection report. Tallichet said the areas identified for needed improvements were "inexcusable," and told Pinero his "lack of performance in making sure they [were] performed everyday [was] a major concern." Pinero was ordered to correct 100 percent of the deficiencies for a re-inspection in 30 days. Tallichet sent identical memos at the same time to five or six other restaurant managers, including his own brother. Despite the memo's harsh language, Tallichet believed Pinero was doing a good job at Castaways. The restaurant posed a number of big challenges for Pinero, which Tallichet felt Pinero was beginning to address.

John Tallichet testified he learned on May 11, 1999, that Pinero had sued Balderrama, five days after he sent the memorandum to Pinero. Tallichet regarded SRC's relationship with Monterey Park as important, and concluded Pinero had made misrepresentations by not disclosing his lawsuit against Balderrama when he was hired. Only the Tallichets and Babaie had authority to discipline a general manager. During the May 18, 1999 meeting, John Tallichet did not direct, nor did he hear anyone else direct, the initiation of any disciplinary action against Pinero. However, Tallichet heard an SRC attorney state that Pinero should have disclosed the lawsuit in his employment application, and that his failure to do so could constitute grounds for firing. After the meeting, Pinero continued to serve as general manager at Castaways without any change in his job title or duties, compensation or benefits. John Tallichet did not speak to Pinero again about the Balderrama lawsuit. Pinero did not complain to Tallichet that Babaie treated him rudely or unfairly. Until Pinero's resignation, Tallichet was unaware Pinero wanted to leave SRC.

Babaie testified he had experienced no problems with Pinero's performance before his transfer to the Castaways. However, performance problems surfaced several months after Pinero's transfer and continued from that point on. Pinero "shirked" his managerial duties by failing to follow through on certain aspects of the restaurant's operations, such as banquet sales. Customarily, when a general manager fails to meet performance standards, Babaie prepares a "write-up" for the person's file. Babaie, however, did not prepare one for Pinero's file because Pinero had been at Castaways for only a few months. As he had done with other managers, Babaie thought it was preferable to afford Pinero additional time to improve his performance, and chose not to damage Pinero's morale by writing him up. Babaie told Pinero he was aware of both his action against Balderrama and the May 18, 1999 meeting at David Tallichet's office. Babaie did not discuss the lawsuit with Pinero; he merely told Pinero it was his own concern, and expressed the hope it would not affect his job performance. Pinero's job duties did not change in any respect

after the May 18, 1999 meeting, nor did SRC subsequently subject Pinero to any employment discipline.

Pinero's attorney, who attended the May 18, 1999 meeting, testified that David Tallichet suggested Pinero drop the action against Balderrama, and said he was hurting SRC by suing a city with which the company did business. During the meeting, David Tallichet told Pinero that, if he was not willing to drop the lawsuit, SRC and Pinero had "nothing to talk about." Pinero's attorney also testified that, during the meeting, an SRC attorney told them the action against Balderrama was frivolous, and that SRC intended to fire Pinero and to sue him for fraudulent misrepresentation and failure to disclose the lawsuit.

Pinero testified that, in early May 1999, David Tallichet informed him he knew about the discrimination lawsuit against Balderrama, and began to pressure him to dismiss the action or settle it for a small sum because of its potential interference with SRC's business relations with Monterey Park.[4] At the meeting at David Tallichet's office, Pinero was told he had made a misrepresentation on his employment application and would be fired. However, on cross-examination, Pinero contradicted himself and admitted no one at the meeting directed him to settle or dismiss the action against Balderrama and that if he did not do so, he would risk termination. After the meeting, Pinero became nervous and fearful about losing his job and the impact a job loss would have on his current effort to purchase a house.

Pinero testified Babaie was generally rude and intimidating to all employees. Before the May 18, 1999 meeting, Babaie did not complain to Pinero about his job performance. After the meeting, however, Babaie began to complain about Pinero's poor performance and did not stop complaining until Pinero resigned. Babaie complained that Pinero was not properly caring for Castaways's gardens, did not fix "the unit," and did not change the doors in a banquet room, even though no funds were budgeted to fix the doors. Babaie also complained about the restaurant profit and sales levels, especially in banquet sales. However, Castaways did not have a banquet director at the time, and SRC—which was responsible for hiring that employee—failed to hire a banquet director until June 1999. Pinero testified Babaie's complaints about restaurant sales were unfounded, and sales actually were slightly higher in February and August 1999 than during the same period in 1998. Babaie also told Pinero to deal with the City of Burbank to resolve problems regarding building permits needed by the restaurant (which had recently been burned to the ground), even though Pinero did not have any construction expertise.

---

[4] Tallichet suggested Pinero settle the case for $2,500. Pinero eventually recovered a judgment of $17,000 in the action against Balderrama.

Pinero further testified that several problems identified in John Tallichet's May 6, 1999 memorandum were nonexistent, while others were the responsibility of Castaways's controller. While the controller did report to the restaurant's general manager, he also sometimes reported directly to SRC's central office. Pinero acknowledged that, as general manager, he was responsible for ensuring that all the employees working at the facility followed the company's rules, and that he was ultimately responsible for "everything that happens at that restaurant."

Pinero acknowledged it was Babaie's job, as his supervisor, to review his job performance and ensure that he followed the company's directives. Pinero began to feel intimidated and pressured by Babaie as soon as he was transferred to Castaways in January 1999. At that point, Babaie began to constantly "nitpick" at Pinero about not maintaining the restaurant's gardens, not changing the pond water, not insisting that employees were properly dressed, and not replacing a missing light bulb. Pinero believed Babaie treated every general manager working under his supervision in the same manner. Babaie's complaints always related either to conditions at the restaurant or to Pinero's work performance. Babaie did not discipline Pinero either before or after the May 18, 1999 meeting, and Pinero did not lose any compensation or benefits. Pinero did not complain to anyone at SRC that Babaie treated him unfairly or intolerably.

After the May 18, 1999 meeting, Pinero testified Babaie subjected him to "more than nitpicking," but Pinero never clarified what he meant by "more than nitpicking." In deposition testimony introduced at trial, in response to a question about specific instances when Babaie pressured him, Pinero said Babaie had "just nitpick[ed] any situation that he [could] put his hands on." Apart from Babaie's "nitpicking," Pinero experienced no job-related problems with anyone at SRC. Before the May 18 meeting, no one at SRC had led Pinero to believe his job was at risk. At no time did David or John Tallichet threaten to terminate Pinero or subject him to any job-related discipline. After the May 18 meeting, Pinero never spoke with David Tallichet again.

In late July or early August 1999, a friend and former SRC employee urged Pinero to interview for a position with American Golf. Following an interview, Pinero was offered a job as food and beverage manager at American Golf. He accepted the offer and submitted his resignation to SRC. Before he was offered the American Golf position, Pinero made no attempt to secure other employment. The American Golf job was the only position for which he interviewed before leaving SRC. At the time, Pinero was afraid he would lose his job at SRC and jeopardize his purchase of a new home.

■ This recitation of the evidence makes it clear that, whether we apply the "materiality" test articulated in *Akers* and *Thomas*, or the less stringent EEOC "deterrence" test which looks only to see whether the employer's action is reasonably likely to deter employees from engaging in protected activity, Pinero has failed to establish a case of retaliation under FEHA. Under both *Akers* and *Thomas*, "to be actionable, the retaliation must result in a substantial adverse change in the terms and conditions of the plaintiff's employment." (*Akers, supra,* 95 Cal.App.4th at p. 1455; see *Thomas, supra,* 77 Cal.App.4th at p. 512 [requiring a "material" change in the terms of employment].) By Pinero's admission, his job responsibilities and title did not change, he was not demoted, and his salary, bonus structure, benefits and all other forms of compensation suffered no impact as a result of his employer's knowledge of his lawsuit against Balderrama.

■ Both Hoss Babaie and John Tallichet criticized Pinero's job performance. The record reveals Tallichet's criticisms were harsher than Babaie's "nitpicks." However, Tallichet's criticisms were levied only once, in early May 1999, almost a week before uncontradicted evidence reveals Tallichet first learned about Pinero's lawsuit, and never repeated. Babaie criticized Pinero's work both before and after learning about the Balderrama action. But, even by Pinero's account, Babaie's criticisms never rose above the level of "nitpicking." Such criticism simply is insufficient. "[A] mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action under [the] FEHA." (*Akers, supra,* 95 Cal.App.4th at p. 1457.) A statutory claim for retaliation may be predicated on an unfavorable evaluation only where the "employer wrongfully uses the negative evaluation to substantially and materially change the terms and conditions of employment . . . ." (*Ibid.*) That did not occur in this case. SRC did nothing affirmative to effect a material change in any term or condition of Pinero's employment as a result of learning about his lawsuit against Balderrama.

SRC's criticisms of Pinero's job performance similarly fail to satisfy the EEOC's deterrence test. To satisfy the test, Pinero must show the criticisms were " 'based on a retaliatory motive and [were] reasonably likely to deter [Pinero] or others from engaging in protected activity.' " (*Ray, supra,* 217 F.3d at pp. 1242–1243.) Pinero cannot demonstrate that.

First, no evidence indicates either of Pinero's supervisors acted from a retaliatory motive. John Tallichet's criticisms of Pinero arose directly from an inspection which disclosed numerous deficiencies at Castaways. The inspection was conducted two weeks before Tallichet learned about Pinero's lawsuit. Moreover, the "scathing criticisms" in the May 6 memorandum Tallichet sent to Pinero were identical to criticisms Tallichet levied against

several other managers. Babaie did tell Pinero he was aware of his lawsuit and the meeting at David Tallichet's office. However, uncontradicted trial evidence indicates Babaie did so to assure Pinero that he considered the matter private, and expected that it would not interfere with his work.

Second, although Pinero alleged that, between May and August 1999, he was subjected to "intolerable continual harassment," the evidence does not support the claim. It shows only that his supervisors complained to him about work-related matters, some of which he admits were warranted, and others he disputes. With respect to items detailed in Tallichet's May 6 memorandum, Pinero denied responsibility for numerous deficiencies, blaming them on the restaurant's auditor who reported directly to SRC, not to him. However, Pinero also admitted that, as general manager, he was ultimately responsible for "everything that happens at [the] restaurant." In any event, a single complaint from a senior supervisor about matters which have merit and are admittedly directly or indirectly related to one's job duties cannot as a matter of law constitute "intolerable continual harassment." Between May and August 1999, the only evidence of criticisms that Babaie levied against Pinero concerned his failure to properly maintain the restaurant's grounds, ensure that employees dressed properly, conduct certain maintenance, and maintain sales at an appropriate level. Other evidence shows Babaie was so unhappy with Pinero's performance that he considered giving him a write-up. However, in view of Pinero's recent arrival at Castaways, a facility that posed new and significant management challenges, Babaie chose instead to give Pinero the benefit of the doubt and an opportunity to improve.

From an objective standard, the evidence does not reveal any employer decision or action which a jury could conclude would be reasonably likely to deter a reasonable employee from engaging in protected activity.[5] Before his promotion, Pinero was a model employee who apparently had never been criticized by his employer. While it is understandable Pinero was angered, displeased or even insulted by the criticisms he received when he took over Castaways, such displeasure is simply not actionable. The trial court correctly concluded, as a matter of law, that the "nitpicking" about which Pinero complained was at most a "minimal inconvenience, not material, not substantial." No basis exists on which to conclude Pinero was subjected to adverse employment action by SRC.[6] The motion for nonsuit was properly granted.

---

[5] It certainly did not deter Pinero. He persisted in insisting the Balderrama matter was personal, and in prosecuting the age discrimination action until he obtained a substantial judgment.

[6] Having found no adverse employment activity on the part of SRC, we need not consider its arguments regarding the third element of the retaliation claim, i.e., the absence of a causal link between Pinero's protected activity and any adverse employment action.

## DISPOSITION

The judgment is affirmed. SRC is to recover its costs on appeal.

Cooper, P. J., and Rubin, J., concurred.