[No. F053239. Fifth Dist. June 4, 2008.]

JOSEPH CORONADO, Plaintiff and Appellant, v.
COBBLESTONE VILLAGE COMMUNITY RENTALS, L.P., et al.,
Defendants and Respondents.

834

## COUNSEL

Oren & Oren and Charles D. Oren for Plaintiff and Appellant.

Prindle, Decker & Amaro and Jack C. Nick for Defendants and Respondents.

## OPINION

**KANE, J.**—Plaintiff Joseph Coronado, a disabled man who is wheelchair-bound, decided to rent a particular apartment at Cobblestone Village, a multiunit complex owned and operated by defendants Cobblestone Village Community Rentals, L.P., and Equity Residential Properties Management Corporation.[1] A barrier to wheelchair access existed on the path outside the apartment. Specifically, the concrete sidewalk leading from plaintiff's apartment to the parking area ended in a raised curb with no access ramp for wheelchairs. Plaintiff was subsequently injured when his wheelchair toppled over while his wife tried to maneuver it off of the raised curb. Plaintiff sued defendants for violation of the Unruh Civil Rights Act (Civ. Code, § 51)[2] and the Disabled Persons Act (§ 54 et seq.). After plaintiff's case was presented at

---

[1] For simplicity, we refer to these entities jointly as defendants unless it seems helpful to the discussion to refer to one defendant separately.

[2] Unless otherwise indicated, all further statutory references are to the Civil Code.

trial, the trial court ruled that the above causes of action would not go to the jury because the statutory provisions were inapplicable to private residential apartments. Plaintiff appeals from that nonsuit order. We will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Cobblestone Village is an apartment complex located in the City of Fresno along both sides of Fruit Avenue. It was constructed in 1982 to 1983 using exclusively private funds. No substantial structural modifications or additions that would require a building permit have occurred since the original construction. The complex is owned and/or managed by defendants.

The leasing office for Cobblestone Village is open to the general public and a wheelchair access ramp is provided at that location.[3] The apartments and common areas around the apartments are reserved for use by tenants and guests of tenants only, although other persons might enter the complex since defendants' employees do not patrol the grounds. Vehicles are able to enter the apartment complex by means of a private driveway that connects with Fruit Avenue and winds through the interior of the complex.

Plaintiff is a quadriplegic. He has some use of his arms and can push his manual wheelchair to some extent, but a certain balance must always be maintained because he lacks upper torso control. He is able to get up a curb ramp in his wheelchair, but with no ramp, a raised curb is an access barrier.

Cobblestone Village has apartment units that are fully accessible to disabled persons; however, such units were already rented at the time plaintiff and his wife, Krystal Coronado, were looking for an apartment. Plaintiff and his wife were shown apartment number 117 (the apartment) by one of the defendants' leasing agents. The apartment was not designed for disability access, but the interior was adequate for plaintiff's needs. There was a concrete path or sidewalk leading from the front door of the apartment to a common use parking area. This path or sidewalk ended at a raised curb next to plaintiff's assigned parking spot. When plaintiff observed the raised curb at the time he was first shown the apartment, he informed defendants' leasing agent that a wheelchair ramp would be needed. The agent indicated he would have to check with management, but he did not think it would be a problem.

---

[3] The leasing office is located on the other side of Fruit Avenue from plaintiff's apartment. In addition to the leasing office, the swimming pool area and at least two of the apartment units had full disability access.

At the time plaintiff and his wife moved into the apartment in October of 2002,[4] a temporary wooden ramp had been placed in the parking lot at the location of the raised curb at the end of the path leading to the apartment. The wooden ramp was placed there at the instruction of defendants' apartment manager. It was constructed out of plywood and two-by-fours by defendants' maintenance employee, who also repaired or replaced it on at least one occasion.

Plaintiff asserted at trial that defendants made numerous promises to put in a concrete wheelchair ramp at the curb. Plaintiff, his wife, and a paralegal testified that assurances were given by several of defendants' employees that a concrete ramp would be built at defendants' expense. Plaintiff and his wife also testified that they were ready and willing at all times to pay the expense themselves of putting in the concrete ramp, and made this fact known to defendants.

Defendants' leasing agents who dealt with plaintiff and his wife denied ever promising a permanent concrete ramp. Linda Kelley, the apartment manager, testified that she told plaintiff and his wife that they had the option of putting in a permanent ramp at their own expense. According to Ms. Kelley, plaintiff and/or his wife never came forward and said " 'Yes[, we] want to put a ramp in.' " Eventually the wooden ramp, which was put in as a temporary convenience only, had to be removed. Thus, defendants' position was that plaintiff simply failed to take advantage of the option of putting in a concrete ramp at plaintiff's expense.

In spring of 2003, for reasons that are not entirely clear,[5] the wooden ramp was removed by defendant Equity Residential Properties Management Corporation. On June 18, 2003, plaintiff's wife was helping plaintiff get down the curb to the parking area in his wheelchair. In the process, the wheelchair tipped over and plaintiff and his wife were injured.

Plaintiff's complaint was filed on February 17, 2005. A first amended complaint set forth the following causes of action: (1) premises liability, (2) constructive eviction, (3) violation of the Unruh Civil Rights Act (§ 51), (4) violation of the Disabled Persons Act (§ 54.1), and (5) injunctive relief under the Disabled Persons Act (§ 55.1).

---

[4] Plaintiff and his wife began renting the apartment in late October of 2002 and moved out in August of 2003.

[5] There was some testimony to the effect that the ramp was removed because it did not appear to be safe or it was in poor condition. Other testimony reflects it may have been mistakenly thrown out because it appeared to be a skateboard ramp or a piece of wood that did not belong there.

On the eighth day of trial and shortly before it would be time to instruct the jury, the trial court ruled on its own motion that the Unruh Civil Rights Act and the Disabled Persons Act were inapplicable in the circumstances of this case and therefore the statutory causes of action would not go to the jury.[6] As explained by the trial court from the bench, even though defendants' leasing office was a public accommodation (and hence subject to the disability access provisions), that fact did not convert the entirety of the apartment complex—including residential areas—into a public accommodation for purposes of the relevant statutes. The minute order stated as follows: "The Court determines, given the law, the research the Court has conducted and the authorities that have been provided for the Court's consideration . . . it does not appear, given the law, nor does there appear to be any facts that would cause an interpretation of the law that would cause or allow the plaintiff's causes of action under any of the disabled persons statutes or discriminatory behavior statutes to go to the jury. . . . [A]nd so, I do not intend to give instructions that pertain to those statutes. [¶] . . . [¶] The Court advises the parties a determination has been made that the corporate entity or partnership of Cobblestone Village is a business, they maintain a business office on the premises and the office is located on the opposite side of the street from the plaintiff's unit in a different section of the apartment complex. The business office is a public accommodation, but the private apartments are not public accommodations within the meaning of any of the statutes cited."

After the conclusion of the trial, the jury returned a defense verdict on the premises liability and constructive eviction causes of action. Judgment in favor of defendants was entered on July 13, 2007. Plaintiff timely appealed from the trial court's order of dismissal or nonsuit of the causes of action under the Unruh Civil Rights Act and the Disabled Persons Act.

---

[6] Plaintiff points out that the trial court failed to comply with standard procedures governing nonsuit motions (see Code Civ. Proc., § 581c). Although the trial court's sua sponte order was unusual, no basis for reversal is shown. First, it is clear the trial court was acting to fulfill its judicial duty to ensure the jury was properly instructed on the law applicable to the case. Once the trial court concluded the disability access statutes were inapplicable in the context of this case, and hence claims based thereon could not as a matter of law go to the jury, it promptly informed the parties of its decision. Second, plaintiff made no objection below on grounds of procedural error or unfairness, and it is apparent the parties understood this was a legal issue that had to be resolved in the case. Third, since the instant appeal requires us to resolve the same legal issues as the trial court faced, and we agree that no cause of action existed under the statutes in question, it would be an idle act for us to reverse the case on procedural grounds simply to have the trial court enter a dismissal. (See § 3532.)

## DISCUSSION

### I. *Standard of Review*

Plaintiff appeals from the equivalent of a nonsuit order entered after the presentation of plaintiff's evidence. (Code Civ. Proc., § 581c.) Thus, we review whether the trial court was correct in concluding that the evidence, when viewed most favorably toward plaintiff's case, afforded no basis for a cause of action under either the Unruh Civil Rights Act or Disabled Persons Act as a matter of law. (See *Pinero v. Specialty Restaurants Corp.* (2005) 130 Cal.App.4th 635, 639 [30 Cal.Rptr.3d 348].) "We will not sustain the judgment ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

The substance of plaintiff's appeal is that the trial court erred because defendants had a *statutory duty* to install a wheelchair ramp at the location of the raised curb so that plaintiff would have access on the only path of travel between the apartment and the parking area. The interpretation and application of statutes present a question of law that we review de novo. (*Sutco Construction Co. v. Modesto High School Dist.* (1989) 208 Cal.App.3d 1220, 1228 [256 Cal.Rptr. 671]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 317, p. 355.) Similarly, the issue of whether a statutory scheme such as the Unruh Civil Rights Act is applicable in a particular context is a question of law that is reviewed de novo. (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 607, fn. 7 [42 Cal.Rptr.2d 50, 896 P.2d 776] [question of whether private club was business enterprise under statute was one of law].)

We consider questions of statutory interpretation in accordance with well-established principles of statutory construction. "[C]ourts must begin with the language of a given statute as the purest expression of legislative intent." (*Gunther v. Lin* (2006) 144 Cal.App.4th 223, 233 [50 Cal.Rptr.3d 317].) Our task is "to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] Toward this end we must accord a reasonable and commonsense interpretation consistent with the Legislature's purpose. [Citation.]" (*Donald v. Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168, 176–177 [266 Cal.Rptr. 804].) "Moreover, 'every statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect.' [Citation.] Statutes relating to the same subject matter are to be read together insofar as reasonably possible. [Citation.]" (*Donald v. Sacramento Valley Bank* (1989) 209 Cal.App.3d 1183, 1190 [260 Cal.Rptr. 49].)

## II. *Causes of Action Based on Structural Barrier Under Unruh Civil Rights Act and Disabled Persons Act*

As noted, plaintiff contends that the existence of the particular structural barrier (i.e., lack of a curb ramp) on the pathway outside the apartment denied his right to full and equal access to a public accommodation, which was therefore actionable under the Unruh Civil Rights Act and the Disabled Persons Act. Defendants counter that the trial court properly granted nonsuit because the barrier did not constitute a violation of any structural access standard applicable to residential facilities. We now address these respective arguments by considering the statutes in question.

### A. *Unruh Civil Rights Act*

■ Section 51, also known as the Unruh Civil Rights Act, provides in part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, *disability* . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b), italics added.) This section "shall not be construed to confer any right or privilege on a person that is conditioned or limited by law or that is applicable alike" to all persons. (§ 51, subd. (c).)
■ Section 52, subdivision (a), authorizes recovery of damages by persons denied the rights that are protected under section 51. However, a plaintiff seeking to establish a cause of action for damages under the Unruh Civil Rights Act "must plead and prove *intentional* discrimination in public accommodations in violation of the terms of the Act." (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1175 [278 Cal.Rptr. 614, 805 P.2d 873], italics added; see *Hankins v. El Torito Restaurants, Inc.* (1998) 63 Cal.App.4th 510, 518 [74 Cal.Rptr.2d 684] [damages under § 52 require intentional violation of § 51]; *Gunther v. Lin, supra,* 144 Cal.App.4th at pp. 247, 257 [same].)[7]

■ The provisions of the Unruh Civil Rights Act, "in light of its broad application to 'all business establishments,' have been held to apply with full force to the business of renting housing accommodations." (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 731 [180 Cal.Rptr. 496, 640 P.2d 115].) Thus, the residential apartment complex in *Marina Point* correctly conceded that "like other business establishments that deal with the public, its freedom or authority to exclude 'customers,' i.e., prospective tenants, from the goods and services it offers, i.e., rental units, is limited by the provisions of the

---

[7] In contrast, recovery under the Disabled Persons Act (§§ 54–55.2) does not require an intentional violation. (*Donald v. Cafe Royale, Inc., supra,* 218 Cal.App.3d at p. 177; *Gunther v. Lin, supra,* 144 Cal.App.4th at pp. 240–241.)

Unruh Civil Rights Act." (*Ibid.*, fn. omitted; see *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 794–796 [191 Cal.Rptr. 320, 662 P.2d 427] [private condominium association was a "business establishment" covered by the Unruh Civil Rights Act].) It is clear from *Marina Point* and *O'Connor* that section 51 is fully applicable to defendants' apartment complex business in the present case, i.e., Cobblestone Village. The question then is not whether section 51 applies to the business enterprise of renting apartments (it does), but whether a cause of action for violation of section 51 may be established in this case under plaintiff's evidence presented at trial.

■ We therefore consider whether section 51 may have been violated by the existence of the structural barrier (i.e., no curb ramp)—a theory that depends on a conclusion that defendants were *required* to make a structural modification to the property. Subdivision (d) of section 51 states: "Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever, beyond that construction, alteration, repair, or modification that is otherwise required *by other provisions of law,* to any new or existing establishment, facility, building, improvement, or any other structure . . . ." (Italics added.) Subdivision (f) of section 51 further declares that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." Thus, on the question of whether a particular structural modification (such as a wheelchair ramp) is required in a given context, section 51 by its own terms looks to *other* provisions of law.

It follows from the above discussion that a cause of action in which a plaintiff seeks damages for disability discrimination under section 51 based on a structural or architectural barrier requires a showing that the barrier existed due to an intentional violation of an applicable law relating to disability access standards. (See *Gunther v. Lin, supra,* 144 Cal.App.4th at p. 247 [§ 51 violation may be founded on structural and architectural barriers that are intentional violation of the Americans with Disabilities Act (ADA)].) Plaintiff contends that defendants *were* required to construct a wheelchair ramp in the present case under the following provisions of law: (1) Government Code section 4450 et seq. and Health and Safety Code section 19955 et seq., and (2) the ADA. We will shortly turn our attention to these statutory schemes to determine if plaintiff is correct. At this point, we emphasize that plaintiff's cause of action under section 51 premised on the existence of a structural barrier depends on whether the lack of a wheelchair ramp at the subject curb constituted an intentional violation of one of these *other* provisions of law relating to disability access.

B. *Disabled Persons Act*

In 1968, the Legislature enacted sections 54, 54.1 and 54.3 as one of two statutory schemes that were specifically designed to prevent discrimination against the physically disabled. (*People ex rel. Deukmejian v. CHE, Inc.* (1983) 150 Cal.App.3d 123, 131–134 [197 Cal.Rptr. 484].) The other statutory scheme, which we address later, consisted of Government Code section 4450 et seq. and Health and Safety Code section 19955 et seq. (*People ex rel. Deukmejian v. CHE, Inc., supra,* at pp. 131–134.)

Sections 54 through 55.2 are now commonly referred to as the Disabled Persons Act and are "intended to secure to disabled persons the 'same right as the general public to the full and free use' of facilities open to the public. [Citation.]" (*Urhausen v. Longs Drug Stores California, Inc.* (2007) 155 Cal.App.4th 254, 261 [65 Cal.Rptr.3d 838].) As originally enacted, violation of sections 54 or 54.1 constituted a misdemeanor as stated in former section 54.3, and enforcement was by government prosecution. (*Marsh v. Edwards Theatres Circuit, Inc.* (1976) 64 Cal.App.3d 881, 887 [134 Cal.Rptr. 844] (*Marsh*).) In 1974, section 55 was added to give individuals aggrieved by violation of sections 54 or 54.1 a right to obtain injunctive relief; and in 1976, section 54.3 was amended to allow such individuals a right to maintain a civil cause of action for damages. (*Donald v. Cafe Royale, Inc., supra,* 218 Cal.App.3d at p. 179 [summarizing statutory history].) These additional enforcement methods were included by the Legislature to "guarantee compliance with equal access requirements" and to help remove "impediments to the physically handicapped['s] interaction in community life . . . ." (*Ibid.*)

The Disabled Persons Act (§§ 54–55.2) differs from the Unruh Civil Rights Act (§§ 51, 52) in at least two respects: (1) there is no intent element under the Disabled Persons Act (*Donald v. Cafe Royale, Inc., supra,* 218 Cal.App.3d at p. 177), but intentional discrimination is a required element for recovery of damages under the Unruh Civil Rights Act; and (2) each act provides for a distinct measure of statutory penalties (cf. §§ 52 & 54.3; *Gunther v. Lin, supra,* 144 Cal.App.4th at p. 257). Due to these significant differences, a plaintiff must elect between seeking damages under sections 52 or 54.3. (§ 54.3, subd. (c); *Gunther v. Lin, supra,* 144 Cal.App.4th at p. 257.)[8]

Section 54, subdivision (a), declares that "Individuals with disabilities . . . have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other

---

[8] Another difference is that the Unruh Civil Rights Act has an express provision authorizing punitive damages (§ 52, subd. (b)(1)), but the Disabled Persons Act does not.

public places." Section 54.1, subdivision (a)(1), states in similar fashion that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, . . . privileges of all common carriers, airplanes, motor vehicles, railroad trains, motorbuses, streetcars, boats, or any other public conveyances or modes of transportation . . . , telephone facilities, adoption agencies, private schools, hotels, lodging places, places of public accommodation, amusement, or resort, and other places to which the general public is invited, subject only to the conditions and limitations established by law . . . and applicable alike to all persons." Both sections 54 and 54.1 were amended in 1996 to add a provision declaring that "[a] violation of the right of an individual under the [ADA] also constitutes a violation of this section . . . ." (§§ 54, subd. (c), 54.1, subd. (d); see Stats. 1996, ch. 498, §§ 1, 1.5, p. 2950.)

Subdivision (b)(1) of section 54.1 includes a specific provision relating to housing accommodations that declares as follows: "Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to all housing accommodations offered for rent, lease, or compensation in this state, subject to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons." " 'Housing accommodations' means any real property, or portion thereof, that is used or occupied, or is intended, arranged, or designed to be used or occupied, as the home, residence, or sleeping place of one or more human beings, but shall not include any accommodations included within subdivision (a) or any single-family residence the occupants of which rent, lease, or furnish for compensation not more than one room therein." (§ 54.1, subd. (b)(2).)

In addition to declaring that the protections of the Disabled Persons Act apply to housing accommodations, subdivision (b) of section 54.1 affirmatively requires that those who rent, lease or otherwise provide such housing do the following: (1) make reasonable accommodations in rules, policies, practices, or services, when necessary to afford individuals with a disability equal opportunity to use and enjoy the premises (§ 54.1, subd. (b)(3)(B)), and (2) permit a disabled tenant to make reasonable modifications at his or her own expense to the rented premises when necessary to afford that tenant full use and enjoyment of the rented premises, which modifications may be conditioned on the tenant's entering into a written agreement to restore the interior of the premises to the original condition (§ 54.1, subd. (b)(3)(A)).[9] Finally, it is provided that "[n]othing in this subdivision shall *require* any person renting, leasing, or providing for compensation real property *to modify his or her property in any way* or provide a

---

[9] Plaintiff does not argue that this section is applicable to his claim that a curb ramp should have been installed. This is correct, since the curb is situated in a common area that is not part of plaintiff's apartment.

higher degree of care for an individual with a disability than for an individual who is not disabled." (§ 54.1, subd. (b)(4), italics added.) The latter section clarifies that subdivision (b) does not by itself mandate the owner or operator of the real property to make any structural modifications, which is consistent with the interpretation that the courts have generally given the Disabled Persons Act, as we discuss below.

█ Historically, sections 54 and 54.1 have been construed to mean that "all physically handicapped are entitled to the same right as the able-bodied to full and free use of public facilities and places," requiring operators of such public facilities and accommodations to " 'open [their] doors on an equal basis to all that can avail themselves of the facilities without violation of other valid laws and regulations.' " (*People ex rel. Deukmejian v. CHE, Inc., supra*, 150 Cal.App.3d at p. 133, quoting *Marsh, supra*, 64 Cal.App.3d at p. 892.) It has been held that these provisions do not, by themselves, require that a business owner structurally modify his or her facilities. (*Marsh, supra*, at pp. 886, 891 [§ 54.1 "does not require affirmative action by way of modifying existing structures"].) As the *Marsh* court concluded following an analysis of the legislative history, "the operator of a business of a type enumerated in Civil Code section 54.1 is not required by the force of that section *alone* to modify its facilities to allow for their use by handicapped persons." (*Marsh, supra*, at p. 892; see *Hankins v. El Torito Restaurants, Inc., supra*, 63 Cal.App.4th at p. 522 [acknowledging *Marsh* rule "that a structural impediment to access does not violate Civil Code section 54.1 unless the impediment also violates a structural access standard"].)

We know of no reason to depart from the analysis in *Marsh* on this issue. In fact, there are at least two sound reasons to follow it. First, it is clear that the Legislature adopted a distinct statutory scheme in 1968–1969 (Gov. Code, § 4450 et seq. and Health & Saf. Code, § 19955 et seq.) to address the separate matter of building access standards and structural modifications. (See, e.g., *People ex rel. Deukmejian v. CHE, Inc., supra*, 150 Cal.App.3d at pp. 131–134 [structural access standards, applicable to new construction or modification of existing facilities, were enacted to "give meaning" to §§ 54 & 54.1]; *Donald v. Sacramento Valley Bank, supra*, 209 Cal.App.3d at pp. 1190–1192 [same].) This fact strongly indicates sections 54 and 54.1 were not themselves intended to require business owners to modify the structure of their premises, as other statutes were adopted for that purpose. Second, the Legislature specifically responded to one aspect of the holding in *Marsh* (that there was no private cause of action for damages) by amending section 54.3 to authorize a private cause of action for specified damages (Stats. 1976, ch. 971, § 2, p. 2270; Stats. 1976, ch. 972, § 2.5, p. 2274; and Stats. 1977, ch. 881, § 3, p. 2651), but left fully intact *Marsh*'s fundamental interpretation of the statutory scheme that a structural barrier does not violate sections 54 or 54.1 unless it *also* violates a separate structural access standard. (See

*Gunther v. Lin, supra,* 144 Cal.App.4th at p. 236 [legislative acquiescence in prior judicial construction of statutory language creates inference that Legislature agreed with that construction].)

■ We conclude that in order to state a cause of action for violation of sections 54 or 54.1 based on a structural or architectural barrier, the existence of the barrier must violate a separate provision of law relating to structural access standards. This means that, as was true in our analysis of section 51, we must look to *other* provisions of law before we can determine whether a cause of action on this theory was sufficiently supported by the evidence.

We now proceed to consider those other laws.

C. *Government Code Section 4450 et seq. and Health and Safety Code Section 19955 et seq.*

As noted, Government Code section 4450 et seq. and Health and Safety Code section 19955 et seq. were enacted in 1968 and 1969 respectively as a means of providing structural access standards in regard to public buildings and facilities. The scope and purpose of these provisions have been aptly summarized as follows: "To give meaning to the public accommodation law prohibiting discrimination against the handicapped, the Legislature enacted Government Code section 4450 et seq. providing for the establishment of standards for buildings constructed with public funds designed to insure accessibility by the handicapped. A year later, the Legislature expanded these requirements to facilities constructed with private funds ([Health & Saf. Code, ]§ 19955 et seq.) and, with certain limited exceptions, required conformance with the same standards set forth within Government Code section 4450 et seq. The underlying legislative intent of these statutory schemes is to require affirmative conduct so as to guarantee access to the physically handicapped upon construction of new facilities or with the repair and alteration of existing facilities. [Citation.]" (*People ex rel. Deukmejian v. CHE, Inc., supra,* 150 Cal.App.3d at p. 133.) That is, disability access standards were first implemented with respect to public buildings or facilities constructed with public funds (Gov. Code, §§ 4450–4458), and were later expanded to include public buildings or facilities constructed with private funds (Health & Saf. Code, §§ 19955–19959; *Donald v. Sacramento Valley Bank, supra,* 209 Cal.App.3d at p. 1191).

Since Cobblestone Village was constructed with private funds, plaintiff's contention is that Health and Safety Code section 19955 et seq. required the construction of a curb ramp at the location where the incident occurred. Defendants respond that the walkway outside plaintiff's apartment is not a

public facility, and therefore Health and Safety Code section 19955 is inapplicable. As explained below, we conclude defendants are correct.

■ Health and Safety Code section 19955, subdivision (a), explains that the purpose of part 5.5 of division 13 of the code (including sections 19955–19959.5) is "to insure that public accommodations or facilities constructed in this state with private funds adhere to the provisions of Chapter 7 (commencing with Section 4450) of Division 5 of Title 1 of the Government Code." The same section defines the term "public accommodation or facilities" as follows: "a building, structure, facility, complex, or improved area *which is used by the general public* and shall include auditoriums, hospitals, theaters, restaurants, hotels, motels, stadiums, and convention centers." (Health & Saf. Code, § 19955, subd. (a), italics added.) Similarly, Health and Safety Code section 19956.5, which relates to public curbs and sidewalks constructed with private funds, states that it applies to "[a]ny curb or sidewalk *intended for public use . . . .*" (Italics added.)

In the present case, there was no evidence to suggest that the cement walkway outside plaintiff's apartment was an area used by the general public or that it was intended for use by the general public. The relevant testimony on this issue indicated that although the general public was invited to the leasing office, only tenants and guests of tenants were supposed to be in residential areas and common areas around the residential areas. Additionally, there was no evidence to indicate that the private lane or driveway going through the interior of defendants' complex, as a means of vehicular access, was intended for use by the general public. Thus, the curb located on the walkway outside plaintiff's apartment was not a public facility or public sidewalk to which the provisions of Health and Safety Code sections 19955 and 19956.5 would apply.

This determination is in accord with a well-reasoned 1982 Attorney General opinion concluding that a mobilehome park recreational building is not a public accommodation or facility within the meaning of the above statutes. As explained by that opinion: "Undoubtedly that facility is open to a more general class than the residents of the park, for surely it is available to their families and invited guests. Use by the expanded group of persons in our view, however, does not reach the use 'by the general public' spoken of in [Health and Safety Code] section 19955. There are still *meaningful restrictions* on who may use the facilities, which considerably narrows their amenability to user from being generally available to the public—as is the case with an auditorium, hospital, theater, restaurant, hotel, motel, stadium or convention center—to being available to a select and definable few. Furthermore, unlike those facilities, the purpose for whose creation is based upon their being made continuously available to the general public and whose

economic viability cannot survive without their being so available, the recreation center at a mobilehome park is neither so created nor dependent. Rather, it is a secondary appendage to another unit, the park itself which, like it, neither contemplates nor needs accessibility of continuous use by the general public for its sustenance. Thus, we do not believe the fact that a recreation building in a mobilehome park might well be used by the residents' families, friends, and invited guests makes it 'a building . . . or facility used by the general public' or a 'public facility or accommodation' within the meaning of [Health and Safety Code] section 19955." (65 Ops.Cal.Atty.Gen. 72, 75 (1982).)

Of further interest in our present case, the same Attorney General opinion rejected an argument that the presence of a commercial office within the mobilehome park converted all structures or areas in the park into a commercial establishment within the meaning of Health and Safety Code section 19955.5. "The main office of the park might be considered engaging in a commercial activity, but surely the individual mobilehomes cannot be so considered, nor do we believe the recreation building itself can be so considered. . . . Thus, while the office of the mobilehome park would be covered by [Health and Safety Code] section 19955.5, since commercial activity is performed within it, that does not extend to the park's recreation building and it would not be covered by the section's mandate." (65 Ops.Cal.Atty.Gen., *supra*, at p. 76.)

In granting the nonsuit order in the present case, the trial court explained that, even though defendants' leasing office was a public accommodation (and hence subject to the structural access standards), that fact would not convert the entirety of the apartment complex—including residential areas—into a public accommodation for purposes of the relevant statutes. We concur with the trial court's analysis on this point—which is also suggested in the above-referenced Attorney General opinion. In a multiuse complex such as this, where there is a commercial office open to the general public but also residential and common areas that are not open to the general public, it is appropriate to consider the particular area in question when attempting to determine the applicability of statutes that provide for structural access standards. We conclude that these statutory provisions did not require defendants to install a curb ramp at the location where plaintiff fell.

D. *Americans with Disabilities Act*

Plaintiff claims that removal of the structural barrier in this case was required by the ADA. As noted previously, the California Legislature has declared that a violation of the ADA constitutes a violation of the Unruh Civil

Rights Act and the Disabled Persons Act.[10] The ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." (42 U.S.C. § 12182(a).) The ADA defines discrimination in a place of public accommodation to include "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable . . . ." (42 U.S.C. § 12182(b)(2)(A)(iv).) The term "readily achievable" means "easily accomplishable and able to be carried out without much difficulty or expense." (42 U.S.C. § 12181(9).)

"Thus, under the ADA, the duty to remove such barriers from public accommodations now extends beyond initial construction and significant alterations of existing structures. 'A public accommodation shall remove architectural barriers in existing facilities, . . . where such removal is readily achievable, i.e., easily accomplishable and able to be carried out without much difficulty or expense.' [Citation.]" (*Madden v. Del Taco, Inc.* (2007) 150 Cal.App.4th 294, 302 [58 Cal.Rptr.3d 313] (*Madden*).) In *Madden,* the Court of Appeal held that a restaurant was required to remove a structural barrier (a cement trash container blocking an accessible route of travel to an entrance) based on the requirement in the ADA to remove barriers where such removal is readily achievable. (*Madden, supra,* at pp. 302–303.)[11] This was so even though the restaurant was otherwise in compliance with structural access standards and had not engaged in any triggering alterations.[12] (*Madden, supra,* at p. 302.)

---

[10] Of course, in the case of the Unruh Civil Rights Act, the violation must be an intentional discrimination or an intentional violation of a structural access standard, as previously discussed.

[11] *Madden* suggests that California building standards would now, like the ADA, require removal of architectural barriers in existing public accommodations that come within the scope of Government Code section 4450 and Health and Safety Code section 19955 et seq. (*Madden, supra,* 150 Cal.App.4th at p. 302, fn. 3.)

[12] When a public accommodation that was constructed prior to the effective date of the ADA is altered or a part of it is altered, the ADA requires that the alterations be made such that "the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." (42 U.S.C. § 12183(a).) Similar provisions for applicability of access standards to postconstruction alteration are set forth in Health and Safety Code section 19959 and Government Code section 4456 regarding buildings constructed prior to the effective dates thereof. These standards are applied to "new facilities or with the repair and alteration of existing facilities." (*People ex rel. Deukmejian v. CHE, Inc., supra,* 150 Cal.App.3d at p. 133.) This is presumably what the *Madden* court meant by a "triggering alteration." The concept of a triggering alteration is not at issue here because, as explained herein, the referenced statutes do not apply to the residential apartment complex or common areas thereof, and in any event there is no evidence of any significant alteration to Cobblestone Village.

Plaintiff contends that *Madden* directly applies here because the installation of a curb ramp, as a means of removal of a structural barrier to access, was readily achievable in this case, especially when the evidence that plaintiff was willing to pay for the installation is considered. Defendants argue that *Madden* is inapplicable because it involved a place of public accommodation as defined under the ADA, while the instant case did not. We agree with defendants' position.

Section 12181 of the ADA defines the term "public accommodation" in terms of "12 extensive categories, which the legislative history indicates 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled." (*PGA Tour, Inc. v. Martin* (2001) 532 U.S. 661, 676–677 [149 L.Ed.2d 904, 121 S.Ct. 1879], fns. omitted.) Section 12181(7) of the ADA states:

"The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—

"(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

"(B) a restaurant, bar, or other establishment serving food or drink;

"(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

"(D) an auditorium, convention center, lecture hall, or other place of public gathering;

"(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

"(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

"(G) a terminal, depot, or other station used for specified public transportation;

"(H) a museum, library, gallery, or other place of public display or collection;

"(I) a park, zoo, amusement park, or other place of recreation;

"(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

"(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

"(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation." (42 U.S.C. § 12181(7).)

 Plaintiff argues the category "inn, hotel, motel, or other place of lodging" (42 U.S.C. § 12181(7)(A)) should be interpreted to include a residential apartment complex. Even when liberally construed, the wording cannot reasonably stretch that far. The described category of "inn, hotel, motel, or other place of lodging" obviously entails places that provide only short-term or transient lodging, not places of residence. This is confirmed by congressional legislative history that explicitly states only nonresidential facilities were intended to be covered by the ADA. (H.R.Rep. 101-485 (II), 2d Sess., p. 303 (1990), reprinted in 1990 U.S. Code Cong. & Admin. News, p. 383.) Finally, federal courts addressing the issue have consistently held that the ADA does not apply to residential facilities such as apartments or condominiums. (*Regents of Mercers. College v. Rep. Franklin Ins.* (3d Cir. 2006) 458 F.3d 159, 165–166, fn. 8 ["residential facilities such as apartments and condominiums are not transient lodging and, therefore, not subject to ADA compliance"]; *Lancaster v. Phillips Investments, LLC* (M.D.Ala. 2007) 482 F.Supp.2d 1362, 1367; *Indep. Housing Services v. Fillmore Ctr.* (N.D.Cal. 1993) 840 F.Supp. 1328, 1344, fn. 14; *Mabson v. Ass'n of Apt. Owners of Maui Kamaole* (D.Hawaii, Aug. 13, 2007, Civ. No. 06-00235DAE-LEK) 2007 U.S.Dist. Lexis 59260 at *30; *Phibbs v. Am. Prop. Mgmt.* (D.Utah, Mar. 19, 2008, No. 2:02CV00260DB) 2008 U.S.Dist. Lexis 21879 at *6–*8.) We concur with the reasoning and conclusions expressed in these cases.

We hold that the portions of Cobblestone Village that are a residential apartment complex are not a public accommodation under the ADA, and therefore are not subject to compliance with the ADA or federal regulations implementing the ADA. Consequently, defendants were not required by the ADA to install a curb ramp at the location outside plaintiff's apartment.

 As was the case with the California discrimination statutes, the mere fact that there was a business office in the apartment complex does not change our conclusion. The legislative history of the ADA indicates it was not intended to apply to portions of a multiuse facility that are residential in character. The 1990 House Report relating to the ADA stated: "Only nonresidential facilities are covered by this title. For example, in a large hotel that

has a residential apartment wing, the residential wing would be covered under the Fair Housing Act . . . rather than by this title. The nonresidential accommodations in the rest of the hotel would be covered by this title." (H.R.Rep. 101-485 (II), *supra,* at p. 303, reprinted in 1990 U.S. Code Cong. & Admin. News, p. 383.) Accordingly, the ADA should be reasonably construed and applied in accordance with this intent. This means that, where there is a multiuse facility in which there is a commercial office open to the general public but also residential and common areas that are not open to the general public, it is appropriate to consider the particular area in question when attempting to determine the applicability of ADA structural access standards or other ADA requirements. (See also 28 C.F.R § 36, appen. B (2007) [indicating that in a mixed use facility the residential portion thereof would not be covered by ADA]; *Indep. Housing Services v. Fillmore Ctr., supra,* 840 F.Supp. at p. 1344 [ADA held inapplicable to residential portions of the larger facility].)

### E. *Summary of Conclusion Regarding Structural Barrier Causes of Action*

As explained hereinabove, a plaintiff seeking to establish a cause of action under the Unruh Civil Rights Act or the Disabled Persons Act based solely on the existence of a structural barrier must be able to show that the failure to remove the barrier constituted a violation of a structural access standard set forth in other provisions of law. In the instant case, none of the statutes that were referred to by plaintiff as the source of such structural access standards was applicable to the residential and common areas of the apartment complex. We have also observed that this result is not affected in this case by the fact that the apartment complex had a leasing office within the facility. Accordingly, no structural barrier cause of action was presented under the allegations and facts of this case as a matter of law and the trial court correctly kept such causes of action from the jury.

In reaching this conclusion regarding the scope of the various statutory schemes, we emphasize that our role is to construe and apply the legislation as it is. This court is not insensitive to the hardships suffered by individuals who have disabilities, but these are peculiarly legislative matters. As aptly stated by the court in *Marsh, supra,* 64 Cal.App.3d at page 888: "The varied and distinctive nature of the numerous handicaps from which so many people suffer suggests . . . that the problem is one which the legislative branch of government is uniquely equipped to solve. It is in the legislative halls where the numerous factors involved can be weighed and where the needs can be properly balanced against the economic burdens which of necessity will have to be borne by the private sector of the economy in providing a proper and equitable solution to the problem."

## DISPOSITION

The judgment is affirmed. Costs are awarded to defendants.

Cornell, Acting P. J., and Hill, J., concurred.

A petition for a rehearing was denied June 25, 2008, and appellant's petition for review by the Supreme Court was denied August 27, 2008, S164804.