[No. A106199. First Dist., Div. Four. July 29, 2008.]

CALIFORNIANS FOR DISABILITY RIGHTS, Plaintiff and Appellant, v. MERVYN'S LLC, Defendant and Respondent.

## COUNSEL

Rosen, Bien & Asaro, Andrea G. Asaro, Holly M. Baldwin; Zelle, Hofmann, Voelbel, Mason & Gette, Daniel S. Mason; Disability Rights Advocates, Sidney Wolinsky, Monica Goracke; The Sturdevant Law Firm, James C. Sturdevant, Monique Olivier; Rosen Bien & Galvan and Sanford J. Rosen for Plaintiff and Appellant.

Robinson, Calcagnie & Robinson and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Chavez & Gertler and Nance F. Becker for California Foundation for Independent Living Centers and American Association of People with Disabilities as Amici Curiae on behalf of Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Janet Gaard, Acting Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Angela Sierra and Timothy M. Muscat, Deputy Attorneys General, for Attorney General of California as Amici Curiae on behalf of Plaintiff and Appellant.

Morrison & Foerster, David F. McDowell, Samantha P. Goodman, Linda E. Shostak and Gloria Y. Lee for Defendent and Respondent.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup and David N. Makous for ReadyLink HealthCare, Inc., as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**SEPULVEDA, J.**—An organization representing disabled individuals sued an operator of retail department stores for maintaining narrow pathways between merchandise display racks that block shoppers with wheelchairs and other mobility aids from reaching the merchandise. In a bench trial, the court found that the retailer denied access to disabled individuals but concluded that widening the merchandise pathways to allow access was not legally mandated because wider pathways would cause a significant loss of selling space and profit. The court also found that the retailer provided an adequate alternative method for making its merchandise available to disabled individuals by designing new and remodeled stores to be physically accessible. The court entered judgment for the retailer.

We reverse the judgment. A retailer must remove architectural barriers to access where such removal is "readily achievable" and, if not readily achievable because of great difficulty or expense, must adopt alternative methods for making its merchandise available to disabled individuals by the provision of customer assistance or other means. (42 U.S.C. §§ 12181(9), 12182(b)(2)(A)(iv), (v).) We find sufficient evidence to support the trial court's finding that the removal of barriers to access is not readily achievable in this instance, and thus not legally mandated. However, we conclude that a retailer does not meet its obligation to make its merchandise available to disabled individuals denied access to the retailer's existing stores by constructing new and geographically distant stores that are accessible. Accordingly, we remand the case for consideration of appropriate alternative means for making merchandise available to disabled individuals who are denied physical access.

## I. PROCEDURAL BACKGROUND

Appellant Californians for Disability Rights (CDR) is a nonprofit corporation organized to protect the interests of persons with disabilities. On May 21, 2002, CDR filed a lawsuit against respondent Mervyn's LLC (Mervyn's), a corporation that operates 125 retail department stores throughout the State of

California.[1] CDR alleged that Mervyn's denied store access to persons with mobility disabilities by failing to provide adequate pathway space between merchandise displays for wheelchairs and other mobility aids. CDR pleaded a single cause of action for injunctive relief under California's unfair competition law, which defines unfair competition to include any unlawful business act or practice. (Bus. & Prof. Code, § 17200 et seq. (the UCL).) CDR alleged that Mervyn's practice of denying access to disabled individuals was unlawful because it violated California's Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and California's Disabled Persons Act (Civ. Code, § 54 et seq.).

The case proceeded to an 18-day bench trial that began in August 2003. The trial court denied relief to CDR and entered judgment in favor of Mervyn's on February 2, 2004. The trial court found that 15 to 20 percent of Mervyn's merchandise was inaccessible to persons using mobility aids, but concluded that the removal of access barriers was not readily achievable, and thus not legally mandated, because full access would necessitate a significant loss of selling space and profit. The court also concluded that Mervyn's provided an alternative method for making its merchandise available to disabled individuals by designing its new and remodeled stores to be physically accessible. CDR appealed the judgment.

While this case was pending on appeal, the voters of California amended the statute under which the case had been prosecuted. The voters' enactment, popularly known as Proposition 64, was passed in the California General Election on November 2, 2004, and went into effect the next day. (Cal. Const., art. II, § 10, subd. (a).) At the time this case was tried, the UCL authorized any person acting for the general public to sue for relief from unfair competition. (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228 [46 Cal.Rptr.3d 57, 138 P.3d 207] (*Mervyn's*).) "Standing to bring such an action did not depend on a showing of injury or damage." (*Ibid.*) Proposition 64 amended the UCL to limit private enforcement to those who have suffered injury in fact and have lost money or property as a result of such unfair competition. (39 Cal.4th at p. 228.) Proposition 64 did not state whether this new limitation applied to pending cases. (39 Cal.4th at p. 229.)

On December 6, 2004, Mervyn's moved to dismiss this appeal upon the claim that Proposition 64's change in standing requirements applied to pending cases. We denied the motion because new legislative enactments are presumed to operate prospectively, rather than retroactively, to avoid unfair impairment of existing rights and obligations. In July 2006, the California Supreme Court reversed our ruling upon concluding that application of Proposition 64's standing requirements to pending cases would *not* constitute

---

[1] Mervyn's was sued as Mervyn's California, Inc.; however, counsel for Mervyn's advises us that the correct corporate name is Mervyn's LLC.

a retroactive application of the law because the initiative measure did not change any existing rights or obligations. (*Mervyn's, supra*, 39 Cal.4th at pp. 232–234.) While the measure "withdraws the standing of persons who have not been harmed to represent those who have," it did not impair any rights because lack of standing is a jurisdictional challenge that can be raised at any time in a legal proceeding. (*Id.* at pp. 232–233.) The high court reversed our denial of Mervyn's motion to dismiss the appeal and remanded the case to us "for further proceedings consistent" with its opinion. (*Id.* at p. 234.)

On remand to this court, CDR asked leave to move for substitution of plaintiff on appeal—it did not contend that it had standing to appeal in its own right as a party aggrieved by the judgment under Code of Civil Procedure section 902. We denied CDR's request and granted Mervyn's motion to dismiss the appeal for lack of standing by CDR. CDR petitioned for review in the Supreme Court. The Supreme Court granted review and transferred the case to us with directions to vacate our decision and to reconsider the cause in light of *United Investors Life Ins. Co. v. Waddell & Reed, Inc.* (2005) 125 Cal.App.4th 1300 [23 Cal.Rptr.3d 387] (*United Investors*) and *Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235 [46 Cal.Rptr.3d 66, 138 P.3d 214] (*Branick*).

*United Investors* held that a plaintiff has standing to appeal dismissal of a UCL complaint following demurrer even if it has no authority to maintain its suit in superior court, because plaintiff "is sufficiently aggrieved by the dismissal of its complaint that it has standing to appeal under Code of Civil Procedure section 902." (*United Investors, supra*, 125 Cal.App.4th at p. 1305.) *Branick* held that Proposition 64 does not forbid amendment of complaints in the trial court to substitute new plaintiffs for those who have lost standing under the new measure. (*Branick, supra*, 39 Cal.4th at pp. 241–242.) The "ordinary rules governing the amendment of complaints" apply. (*Id.* at p. 239.)

Upon reconsideration, we denied Mervyn's motion to dismiss the appeal in a ruling we issued on April 17, 2007. We concluded that the two cases referenced by the high court, "when read in conjunction, lead to the following conclusion: CDR is a party aggrieved by entry of judgment against it and thus has standing to appeal the judgment even if CDR has no authority to maintain its suit in superior court (*United Investors, supra*, 125 Cal.App.4th at pp. 1304–1305); and, if CDR succeeds in its effort to reverse the judgment on appeal, it may seek leave in the superior court to amend its complaint to substitute a plaintiff who meets the Proposition 64 standing requirement. (*Branick, supra*, 39 Cal.4th at pp. 240–244.)" Mervyn's petitioned for review in the Supreme Court, and the petition was denied on July 18, 2007.

The parties completed briefing on the merits of the appeal in January 2008, and the matter was argued and submitted for decision. We now turn to the trial court's factual findings following the bench trial, and then proceed to discuss CDR's claims raised on appeal.

## II. THE TRIAL COURT'S FACTUAL FINDINGS

At the time of trial, Target Corporation operated a total of 1,476 stores nationwide, in three separate divisions: Target Stores, Mervyn's, and Marshall Field's.[2] Mervyn's has 266 retail department stores nationwide, 125 of which are located in California. Mervyn's California stores range in size from 52,726 to 108,235 square feet. "Mervyn's stores are designed to be self-service: Customers are expected to maneuver independently through the store to the display units to examine and [to] select merchandise from display units, remove the merchandise[,] and then bring it to a sales counter to purchase."

Mervyn's stores generally have a single wide, hard-surface aisle that runs from the stores' entrances to the various departments. The stores have seven departments: women's clothing, men's clothing, children's clothing, lingerie, accessories/jewelry, home, and shoes. Each department consists of one or more carpeted "pads" in which the merchandise is placed on display units that include racks, shelves, and other structures to display merchandise. All display units are moveable; they are not permanently affixed to a structure. Every Mervyn's store uses hundreds of these moveable display units, which fill the store's selling space. The display units are arranged to create pathways within the merchandise-selling pads.

Persons using mobility aids, like wheelchairs, generally need a minimum of 32 inches of clearance to traverse a pathway. The pathways between merchandise display units at Mervyn's do not all provide 32 inches of clearance. Mervyn's does not impose, as a requirement, the maintenance of any minimum space in pathways created by moveable display units at any of its stores. Mervyn's does have corporate "guidelines" for the arrangement of display units, but these guidelines themselves call for only 18 inches of clearance between "horizontal" merchandise pathways, which are those running parallel to the store's back wall. Mervyn's guidelines do advise 32 inches of clearance for "vertical" merchandise pathways, which are those

---

[2] Target Corporation sold Mervyn's in September 2004.

running parallel to the main aisle from the entrance to the back wall of a department. Mervyn's guidelines also advise 36 inches of clearance at the back wall of a department. But the guidelines are not requirements, and are not universally implemented. Between 15 to 20 percent of the vertical pathways at Mervyn's stores provide less than 32 inches of clearance.[3]

Persons with mobility disabilities testified at trial that they were often unable to enter more than a few feet into departments. Even when able to partially enter departments at Mervyn's, witnesses testified that narrowing pathways, dead ends, and protruding merchandise have caused them at times to become stuck or stranded within merchandise pads. Witnesses testified to racks in narrow aisles becoming caught or lodged in their mobility devices, sometimes causing racks to tip over and fall on top of them, or at other times, causing their mobility device to jolt forward or stop abruptly. Several witnesses testified that protruding arms of tightly spaced merchandise racks have physically injured them.

Mervyn's has no policy prohibiting the placement of moveable display units that obstruct people with disabilities from using pathways across merchandise pads. Nor has Mervyn's designated any specific individual with corporate responsibility for assuring access to merchandise for people with mobility disabilities. Mervyn's asserted at trial that it provides customer service to the extent it fails to provide actual physical access to merchandise for customers with disabilities. Mervyn's trains all of its employees on how to assist disabled customers. But Mervyn's does not designate any employees specifically to provide customer service to customers with disabilities in its stores. Mervyn's sales clerks are charged with assisting customers in locating merchandise, but the clerks' primary responsibility is processing purchases at the sales counter. Several disabled persons who testified at trial reported instances where they received assistance from Mervyn's employees when they sought help but the witnesses testified that they generally have difficulty getting the attention of sales clerks at Mervyn's stores, and are rarely able to get adequate customer assistance. Several witnesses also testified that, because they are seated in their mobility aids and because the pathways are narrow and clogged, they often cannot see the merchandise and therefore

---

[3] CDR's expert witness claimed a higher percentage of narrow pathways, but the trial court rejected that testimony in favor of the testimony of Mervyn's employees. We accept the trial court's determination, as it is not our place to reweigh the evidence. (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622–623 [34 Cal.Rptr.2d 26].) It should be noted that CDR's chief complaint is with the width of the vertical pathways. CDR asserts on appeal that full implementation of guidelines calling for 32-inch vertical pathways would allow access to most of Mervyn's merchandise because one could travel down a 32-inch vertical pathway, "turn, and go down the next" vertical pathway, and thus avoid the horizontal 18-inch pathways. Where one is to "turn" is unclear, presumably at the back wall where guidelines advise a 36-inch pathway.

have difficulty telling an employee what items to bring them. Mervyn's vice-president of stores admitted that having to ask a salesperson to bring items to a customer is not an adequate substitute for the customer being able to reach or look at the items himself or herself, unless the customer knows exactly what items he or she wants.

Plaintiff presented an expert witness, Jonathan Adler, who offered proposals for rearranging the display units on Mervyn's sales floors in ways he believed would result in improved access.[4] Adler is a consultant who advises government and private entities on compliance with disability laws. He testified that his consulting services include "helping business owners survey their existing facilities and providing recommendations for how to correct access barriers." Adler testified that Mervyn's could improve access by utilizing wasted floorspace in some departments and by repositioning display units.

Mervyn's countered with the testimony of its director of store design, John Calderon, who said that Adler's proposals would reduce selling space and were contrary to accepted retailing techniques for displaying merchandise. Mervyn's also presented the expert witness testimony of Tyzoon Tyebjee, Ph.D., a marketing professor. Tyebjee conducted a field test of six Mervyn's stores that were respaced with a 32-inch clearance for all vertical pathways between merchandise display units. Respacing the test stores required removal of about 4 percent of display racks, on average. Tyebjee concluded that respacing stores with 32-inch vertical pathway clearance had "an adverse impact on sales at Mervyn's." Clay Creasey, Mervyn's chief financial officer, quantified the lost profit for the six test stores over the course of the nine-month test at approximately $1 million. Creasey calculated that if the test spacing criteria were expanded to all California stores, the result would be approximately $70 million in lost sales and $30 million in lost profit annually.

## III. DISCUSSION

■   CDR brings this case under California's UCL, which defines unfair competition to include any unlawful business act or practice. (Bus. & Prof. Code, § 17200 (section 17200).) "By proscribing 'any unlawful' business

---

[4] Plaintiff also offered a marketing professor as an expert witness, Michael Levy, Ph.D. Levy was offered as an expert on business practices useful for easing congestion of retail merchandise, including certain distribution techniques and inventory protocols. The trial court struck Levy's testimony upon concluding that the professor's generalized testimony was irrelevant to assessing Mervyn's specific business operations. Finding no abuse of discretion, we affirm the trial court's exclusion of Levy's testimony. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900–901 [122 Cal.Rptr.2d 802].)

practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) CDR claims Mervyn's has unlawfully failed to provide disabled customers with full and equal access to its retail department stores, in violation of state law under California's Unruh Civil Rights Act (the Act) (Civ. Code, § 51 et seq.) and the Disabled Persons Act (the DPA) (Civ. Code, § 54 et seq.), which incorporate protection standards of the federal Americans with Disabilities Act of 1990 (ADA; 42 U.S.C. § 12101 et seq.). To determine if Mervyn's business practice is unlawful, we must first review an array of disability civil rights laws. We then turn to a consideration of CDR's claims on appeal.

## A. Overview of disability civil rights law

### 1. Federal law: The ADA

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. In studying the need for such legislation, Congress found that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.' " (*PGA TOUR, Inc. v. Martin* (2001) 532 U.S. 661, 674–675 [149 L.Ed.2d 904, 121 S.Ct. 1879].) "Congress noted that the many forms such discrimination takes include 'outright intentional exclusion' as well as the 'failure to make modifications to existing facilities and practices.' [Citation.] After thoroughly investigating the problem, Congress concluded that there was a 'compelling need' for a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.' " (*Id.* at p. 675.)

■ "In the ADA, Congress provided that broad mandate. . . . To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." (*PGA TOUR, Inc. v. Martin, supra*, 532 U.S. at p. 675, fns. & citation omitted.) We are concerned here with title III of the ADA, which states a "general rule" of nondiscrimination in public accommodations: "No individual shall be discriminated against on the basis of disability in the full and

equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." (42 U.S.C. § 12182(a).) Supplementing this general rule are specific prohibitions. (42 U.S.C. § 12182(b)(2); see *Spector v. Norwegian Cruise Line Ltd.* (2005) 545 U.S. 119, 128–129 [162 L.Ed.2d 97, 125 S.Ct. 2169] [explaining structure of ADA title III].) Among its specific prohibitions, "Title III of the ADA prohibits discrimination on the basis of disability . . . both with respect to the accessibility of their physical facilities and with respect to their policies and practices." (*Moeller v. Taco Bell Corp.* (N.D.Cal. 2004) 220 F.R.D. 604, 606.)

■  Congress adopted two distinct standards for regulating building accessibility: one to apply to facilities existing before January 26, 1993, and the other to apply to facilities newly constructed or altered on or after January 26, 1993. (42 U.S.C. §§ 12182(b)(2)(A)(iv), 12183(a).) A congressional committee remarked that the distinction between existing and new facilities "reflects the balance between the need to provide access for persons with disabilities and the desire to impose limited cost on businesses. Because retrofitting existing structures to make them fully accessible is costly, a far lower standard of accessibility has been adopted for existing structures." (H.R.Rep. No. 101-485 (III), 2d Sess., p. 60 (1990).)

Under the ADA, "existing facilities" must remove architectural barriers "where such removal is readily achievable," meaning "easily accomplishable and able to be carried out without much difficulty or expense." (42 U.S.C. §§ 12182(b)(2)(A)(iv), 12181(9).) If removal of architectural barriers from an existing facility is not readily achievable, the facility must make its goods and services available to disabled individuals through "alternative methods if such methods are readily achievable." (42 U.S.C. § 12182(b)(2)(A)(v).) In contrast, new and altered facilities must be "readily accessible . . . and usable," and must comply with extensive and detailed regulations, amounting to a federal building code, known as the ADA Accessibility Guidelines. (42 U.S.C. § 12183(a); 28 C.F.R. § 36, appen. A (2007).)

■  As previously noted, the ADA prohibits discrimination on the basis of disability in places of public accommodation with respect to the accessibility of their physical facilities *and* with respect to their policies and practices. (*Moeller v. Taco Bell Corp., supra,* 220 F.R.D. at p. 606.) In the ADA's specific prohibitions section, discrimination is defined to include "a failure to make reasonable modifications in policies, practices, or procedures, when

such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." (42 U.S.C. § 12182(b)(2)(A)(ii).)

■ The ADA permits reliance on state laws that provide greater protection. (42 U.S.C. § 12201(b).) In describing the ADA's relationship with other laws, the ADA states: "Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter. . . ." (*Ibid.*)

### 2. State law: The Act and the DPA

■ The Act and the DPA entitle disabled individuals to full and equal access to public accommodations. (Civ. Code, §§ 51, subd. (b), 54.1, subd. (a)(1).) The Act provides broad civil rights protection: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).) The DPA protects the civil rights of disabled individuals, and states: "Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to . . . places of public accommodation, amusement, or resort, and other places to which the general public is invited . . . ." (Civ. Code, § 54.1, subd. (a)(1).)

As the federal government does with the ADA, California mandates specific requirements for building accessibility by statute. (Gov. Code, § 4450 et seq.; Health & Saf. Code, §§ 19956, 19959.) "All buildings constructed or altered after July 1, 1970, must comply with standards governing the physical accessibility of public accommodations. [Citation.] From December 31, 1981 until the present, the standards have been set forth in Title 24 of the California regulatory code [Cal. Code Regs., tit. 24]." (*Moeller v. Taco Bell Corp., supra,* 220 F.R.D. at p. 607, fns. omitted; see *People ex rel. Deukmejian v. CHE, Inc.* (1983) 150 Cal.App.3d 123, 134 [197 Cal.Rptr. 484] [explaining evolution of state building standards].) A violation of a California

Code of Regulations, title 24 (title 24) building standard that denies access to a disabled individual has been found to constitute a violation of both the Act and the DPA. (*Hankins v. El Torito Restaurants, Inc.* (1998) 63 Cal.App.4th 510, 521 [74 Cal.Rptr.2d 684] [DPA]; *Moeller v. Taco Bell Corp., supra*, at p. 607 [the Act and the DPA]; cf. *Wilson v. PFS, LLC* (S.D.Cal. 2007) 493 F.Supp.2d 1122, 1125–1126 [questioning the extent to which the Act requires intentional discrimination].)

A violation of the ADA also constitutes a violation of both the Act and the DPA. (Civ. Code, §§ 51, subd. (f), 54, subd. (c).) "After the ADA was passed in 1990, the California Disabled Persons Act and the Unruh Civil Rights Act were amended to provide that a violation of the ADA constitutes a violation of their provisions. [Citations.] Thus, a plaintiff whose rights are violated under the ADA may now seek damages under the California statutes . . . ," and is not limited to injunctive relief as plaintiffs are under federal law. (*Pickern v. Best Western Timber Cove Lodge Marina* (E.D.Cal. 2002) 194 F.Supp.2d 1128, 1131.) The expansion of California law to include ADA violations had other effects. For example, title 24 does not require facilities that predate its enactment to comply with its regulations unless and until the facility is altered. (*Pickern*, at p. 1131, fn. 4.) In contrast, "[t]he ADA requires existing facilities to remove barriers to access so long as removal is readily achievable, regardless of whether the facility has been altered." (*Ibid.*) By amending the Civil Code to provide that a violation of the ADA is also a violation of the Act and the DPA, the Legislature authorized the filing of civil actions under state law to enforce the federal requirement that architectural barriers be removed where it is readily achievable to do so, and that alternative means of access be provided where physical access is not readily achievable.

B. *Appellant CDR's claims on appeal*

    1. *We do not reach CDR's claim that state law provides access rights broader than ADA standards*

The parties are agreed that a violation of the federal ADA or state building standards in title 24 constitutes a violation of the DPA. The parties disagree on whether a violation of the ADA or a structural access standard under title 24 is the *only* act that can constitute a violation of the DPA where architectural barriers are at issue. Here, the trial court found title 24 inapplicable, because it is silent on the matter of moveable merchandise display units, and found no ADA violation upon concluding that removal of the access barrier created by merchandise display units was not readily achievable.

The parties do not dispute the trial court's finding that title 24 is inapplicable.[5] The dispute lies with the court's findings that the DPA's " 'full and equal access' " standard is "coextensive" with ADA standards. CDR argues that the state DPA mandates full and equal access without qualification, and thus requires the removal of architectural barriers from existing facilities regardless of whether removal is readily achievable within the meaning of the ADA. In response, Mervyn's says the DPA does not compel the removal of architectural barriers except as required by the ADA or specific building code requirements under title 24. CDR's challenge raises an interesting issue about the scope of state disability laws, and has attracted the attention of the California Attorney General and several disability rights organizations, who have filed amicus curiae briefs in support of CDR's position.[6]

While the issue has attracted attention on appeal, it was never adequately presented in the trial court. CDR's trial argument for DPA protection broader than ADA standards was undeveloped. CDR vaguely insisted that the DPA's guarantee of full and equal access imposed "affirmative obligations," but CDR never clearly distinguished the state obligation from the federal ADA obligation to remove access barriers. Notably, CDR never addressed perhaps the most pertinent authority on the subject at the time of trial: *Marsh v. Edwards Theatres Circuit, Inc.* (1976) 64 Cal.App.3d 881 [134 Cal.Rptr. 844] (*Marsh*).[7] *Marsh*, which predated the ADA but postdated state building standards, held that the DPA does *not* impose an affirmative duty to eliminate access barriers except as required by specific building standards. (*Marsh*, at pp. 886–888.) *Marsh* found that specific legislation mandating building standards governed alleged architectural barriers, not the DPA's general guarantee of "full and equal access." (*Marsh*, at pp. 886–888.) This district Court of Appeal has noted, in addressing a different aspect of the DPA, that *Marsh* "may establish a rule that a structural impediment to access does not violate [the DPA] unless the impediment also violates a structural access standard." (*Hankins v. El Torito Restaurants, Inc., supra*, 63 Cal.App.4th at p. 522; see Cal. Dept. of Justice, Legal Rights of Persons with Disabilities (Nov. 2003) p. 13 [the DPA alone does not require an establishment to make

---

[5] In similar litigation against a retailer for narrow merchandise pathways, a federal district court held that title 24's regulations on the width of aisles are inapplicable to pathways between moveable merchandise displays. (*Lieber v. Macy's West, Inc.* (N.D.Cal. 1999) 80 F.Supp.2d 1065, 1078–1079.) We express no opinion on the matter.

[6] The Attorney General's support appears limited, however. The Attorney General maintains that the state guarantee of "full and equal" access is broader than the ADA's similar guarantee in cases involving a discriminatory policy. It is not clear that the Attorney General would take the same expansive view in cases involving architectural barriers, which is what we determine this case to concern.

[7] Recent authority, cited by Mervyn's before oral argument on appeal, follows the *Marsh* analysis. (*Coronado v. Cobblestone Village Community Rentals, L.P.* (2008) 163 Cal.App.4th 831 [77 Cal.Rptr.3d 883].)

structural modifications].) The Fifth District Court of Appeal recently found that *Marsh* does establish such a rule, and followed it. (*Coronado v. Cobblestone Village Community Rentals, L.P.,* supra, 163 Cal.App.4th at p. 844.) CDR never addressed *Marsh* (or the principles it espoused) in the trial court, and continues to overlook *Marsh* on appeal. "Points not raised in the trial court will not be considered on appeal." (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486 [61 Cal.Rptr.2d 341].)

In any event, resolution of the DPA's scope is unnecessary here. As discussed in detail below, we conclude that CDR proved a violation of ADA accessibility standards, and thus a DPA violation. We need not, and thus do not, determine whether Mervyn's violated state statutes independent of the ADA violation.

  2. *Mervyn's denial of physical access to merchandise must be evaluated under ADA standards applicable to architectural barriers, not discriminatory policies*

The starting point of our ADA analysis is the trial court's factual finding, uncontested by Mervyn's on appeal, that between 15 and 20 percent of the vertical pathways between merchandise display units in Mervyn's department stores are inaccessible to disabled individuals using mobility aids. The stores at issue on appeal were constructed before 1993, and thus are "existing facilities" within the meaning of the ADA. A preliminary legal issue is whether the denial of access to merchandise is an architectural barrier (42 U.S.C. § 12182(b)(2)(A)(iv)), as Mervyn's contends, or a discriminatory policy (42 U.S.C. § 12182(b)(2)(A)(ii)), as CDR contends. The distinction is important because the two types of discrimination are evaluated differently under the ADA. The trial court evaluated the case under both types of discrimination. We conclude that the case presents architectural barrier discrimination.

The ADA defines discrimination to include, among other things (1) "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations" (42 U.S.C. § 12182(b)(2)(A)(ii)); and (2) "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable" (42 U.S.C. § 12182(b)(2)(A)(iv)).

We acknowledge an initial hesitancy to regard moveable displays as an "architectural" barrier, as the term suggests permanent structures. However, courts presented with similar claims of narrow pathways through merchandise displays have used an architectural barrier analysis. (*Colorado Cross-Disability Coal. v. Too (Delaware)* (D.Colo. 2004) 344 F.Supp.2d 707, 710–712 (*Too*); *Shimozono v. The May Dept. Stores Co.* (C.D.Cal. 2002) 2002 WL 34373490, pp. *2, *6; *Lieber v. Macy's West, Inc., supra,* 80 F.Supp.2d at p. 1079.)[8] The United States District Court for the District of Colorado articulated an extensive and persuasive explanation for why the arrangement of moveable displays in a retail clothing store is best evaluated as an architectural barrier. (*Too, supra,* at pp. 710–712.) The court first noted that the term "architectural" commonly refers to a building's structural elements but found that legislative history compels a broader understanding of the term. (*Ibid.*) As the court discerned, Congress used the term to mean "physical barriers" and expressly mentioned moveable display racks as a type of physical barrier governed by 42 United States Code section 12182(b)(2)(A)(iv). (*Too,* at pp. 710–711, citing H.R.Rep. No. 101-485 (II), 2d Sess., p. 110 (1990).)

In discussing the reach of the ADA section governing "architectural barriers" in existing facilities, a congressional committee said: "This section may require the removal of physical barriers, including those created by the arrangement o[r] location of such temporary or moveable structures as furniture, equipment, and display racks. For example, a restaurant may need to rearrange tables and chairs, or a department store may need to adjust its layout of display racks and shelves, in order to permit access to individuals who use wheelchairs, where these actions can be carried out without much difficulty or expense." (H.R.Rep. No. 101-485 (II), 2d Sess., p. 110 (1990).)

Regulations issued under the ADA reflect the same broad meaning of architectural barriers. The regulations provide that "[a] public accommodation shall remove architectural barriers in existing facilities . . . where such removal is readily achievable," and offer as an example "[r]earranging tables, chairs, vending machines, display racks, and other furniture." (28 C.F.R. § 36.304(a), (b)(4) (2007).) United States Department of Justice (DOJ) publications are in accord. One publication states that retailers must provide a

---

[8] Unpublished cases from federal courts may be cited. (*Bowen v. Ziasun Technologies, Inc.* (2004) 116 Cal.App.4th 777, 787, fn. 6 [11 Cal.Rptr.3d 522].) We note, however, that one who cites a case available only in a computer-based source must attach a copy of the case to the brief. (Cal. Rules of Court, rule 8.1115(c).) Mervyn's counsel is reminded to comply with this rule in the future.

36-inch minimum width route "between displays and shelves if readily achievable," which is the standard applicable to architectural barriers in existing facilities. (DOJ & U.S. Small Business Admin., Americans with Disabilities Act: ADA Guide for Small Businesses (1999) p. 10.) Another DOJ publication reiterates the regulatory requirement that display racks be rearranged to provide access, if readily achievable. (DOJ, Americans with Disabilities Act, ADA Title III Technical Assistance Manual (1992) § 4.4200, pp. 31–33 (ADA Manual).) That publication also broadly defines "architectural barriers" as "physical elements of a facility that impede access by people with disabilities. These barriers include more than obvious impediments such as steps and curbs that prevent access by people who use wheelchairs." (*Id.*, § 4.4100, at p. 30.) The DOJ states: "Impediments caused by the location of temporary or movable structures, such as furniture, equipment, and *display racks*, are also considered architectural barriers." (*Id.*, § 4.4100, at p. 31, italics added.)

■ We thus conclude that a physical arrangement of merchandise display racks that denies access to the disabled in stores constructed before 1993 should be evaluated as an architectural barrier under the ADA. (42 U.S.C. § 12182(b)(2)(A)(iv).) We see no basis for treating Mervyn's physical arrangement of its merchandise as a "policy" subject to different evaluative standards. (42 U.S.C. § 12182(b)(2)(A)(ii).) The discriminatory policy provision of the ADA has been applied to far different circumstances from those presented here, such as a golf tournament rule precluding use of golf carts that excluded a golfer with a circulatory disorder from competition (*PGA TOUR, Inc. v. Martin, supra*, 532 U.S. at pp. 668, 682); a restaurant policy of denying use of an employee restroom to a customer with a leg prosthesis and crutches who could not reach the public restroom up a flight of stairs (*Hankins v. El Torito Restaurants, Inc., supra*, 63 Cal.App.4th at pp. 515, 524); and a brewery's no animal policy that excluded a guide-dog-assisted blind man from a public tour (*Johnson v. Gambrinus Company/Spoetzl Brewery* (5th Cir. 1997) 116 F.3d 1052, 1055–1058).

The alleged "policy" CDR challenges is Mervyn's "policy or practice of maintaining narrow pathways that prevent or impede access to the merchandise at its stores." This is plainly a claim that Mervyn's is creating physical barriers that directly bar access to all disabled individuals, and is not a claim of an intangible policy that can be modified to accommodate particular individuals. A plaintiff cannot be permitted to recharacterize architectural access barriers as a *policy* of maintaining access barriers, without destroying the statutory framework that distinguishes between barriers and policies.

Where a plaintiff complains that specific physical features at a facility deny access, the complaint is best assessed under principles governing architectural barriers rather than policies. (See *MacClymonds v. IMI Investments, Inc.* (S.D.Tex., Apr. 5, 2007, No. H-05-2595) 2007 WL 1306803, p. *3 [refusing use of policy paradigm where complaint alleged narrow walkway and other physical accessibility problems].) Accordingly, we conclude that Mervyn's physical arrangement of moveable display racks is best evaluated as an architectural barrier.

3. *Architectural barriers must be removed if removal is readily achievable*

Discrimination under the ADA includes "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." (42 U.S.C. § 12182(b)(2)(A)(iv).) Moreover, "where an entity can demonstrate that the removal of a barrier . . . is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods" is discrimination, "if such methods are readily achievable." (42 U.S.C. § 12182(b)(2)(A)(v).)

■ "The term 'readily achievable' means easily accomplishable and able to be carried out without much difficulty or expense. In determining whether an action is readily achievable, factors to be considered include—[¶] (A) the nature and cost of the action needed under this chapter; [¶] (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility; [¶] (C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and [¶] (D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity." (42 U.S.C. § 12181(9).)

■ ADA regulations provide additional guidance. The regulations list "[r]earranging . . . display racks, and other furniture" among 21 examples of specific "steps to remove barriers." (28 C.F.R. § 36.304(b)(4) (2007).) Public accommodations are urged "to take measures to comply with the barrier removal requirements" in the order of certain priorities. (28 C.F.R. § 36.304(c) (2007).) The first priority is access to the facility from the street, and the next priority is "access to those areas of a place of public accommodation where goods and services are made available to the public. These measures include, for example, adjusting the layout of display racks, [and] rearranging tables . . . ." (28 C.F.R. § 36.304(c)(1), (2) (2007).)

However, the regulations further provide that "[t]he rearrangement of temporary or movable structures, such as furniture, equipment, and display racks is not readily achievable to the extent that it results in a significant loss of selling or serving space." (28 C.F.R. § 36.304(f) (2007).) At least one court has held that the " 'significant loss of selling space' " standard is "only meaningful to the extent that it affects operations." (*Lieber v. Macy's West, Inc., supra*, 80 F.Supp.2d at p. 1078.) "The ADA statute makes clear that the readily achievable barrier removal obligation must consider the 'overall financial resources,' 'effect on expenses and resources,' and the 'effect on operations' of the facilities involved in the action." (*Ibid.*) In calculating the financial resources of a facility, the DOJ states that the resources of both the local facility and parent entity must be considered. (ADA Manual, *supra*, § 4.4200, p. 32.) In practice, this has meant consideration of the financial resources of both the immediate corporate entity owner and its parent corporation. (See *Guzman v. Denny's Inc.* (S.D. Ohio 1999) 40 F.Supp.2d 930, 932, 936 [inaccessible restroom at a single Denny's restaurant; court considered resources of Denny's and its parent corporation].)

The defendant bears the ultimate burden of proving that removal of an architectural barrier is not readily achievable, as an affirmative defense. (*Colorado Cross Disability v. Hermanson Family* (10th Cir. 2001) 264 F.3d 999, 1002–1003 (*Hermanson*).) Every federal court that has considered the matter has put "the initial burden on the plaintiff to introduce evidence tending to show that the proposed method of removal of an existing architectural barrier is readily achievable." (*MacClymonds v. IMI Investments, Inc., supra*, 2007 WL 1306803 at p. *5 [collecting cases].) If the plaintiff meets its burden of production, then the defendant must counter with evidence of its own and "carries the ultimate burden of persuasion on its defense that removal is not readily achievable . . . ." (*Ibid.*) There is "[s]ome variance among courts . . . concerning how much evidence and what type of evidence is required for the plaintiff to meet his burden." (*Id.* at p. *6 [collecting cases].) Some courts have set the threshold low. (E.g., *Massachusetts v. E\*Trade Access, Inc.* (D.Mass. 2006) 464 F.Supp.2d 52, 61.) The Massachusetts court observed: "Practically speaking, there may often be an information imbalance between a plaintiff and a defendant, with the defendant possessing the additional experience and knowledge gained from owning and operating the facility containing the architectural . . . barrier. Nevertheless, a plaintiff should at a minimum provide a general removal plan and discuss its feasibility, bearing in mind both structural concerns and estimated costs." (*Ibid.*) Other courts have set the threshold high. (E.g., *Hermanson, supra*, 264 F.3d at p. 1009 [requiring "precise cost estimates" and "a specific design" for a proposed wheelchair ramp].)

### 4. *CDR produced prima facie evidence that the removal of architectural barriers was readily achievable*

CDR presented an expert witness who testified at length about proposals to remove the architectural barriers created by Mervyn's arrangement of its merchandise display units. The trial court found that "[p]laintiff has suggested various ways of removing barriers created by narrow pathways. These include rearranging fixtures on the floor, rearranging departments to use extra space from other departments, using more efficient fixtures, using space on the wide main aisle, using MAPS [Merchandise Adjacency Plans for laying out merchandise] that are designed for particular stores and that include minimum pathway widths, measuring pathway widths on a systematic basis, and enforcing Mervyn's own spacing guidelines." Nevertheless, the trial court deemed this evidence insufficient to meet CDR's initial burden of producing evidence that removal of barriers was readily achievable. The trial court, in reliance upon the strict standard of *Hermanson, supra*, 264 F.3d at page 1009, faulted CDR's proposals as "entirely conceptual," "unconnected to any cost estimates," and made "without regard to merchandising or retail needs" by a disability access expert unfamiliar with Mervyn's merchandise presentation plans. The court noted, for example, that plaintiff's proposals for rotating tables away from the main aisle and removing rack extensions would reduce merchandise visibility, contrary to a "basic retailing technique." CDR says that the court set the threshold for its prima facie case too high. We agree.

As the United States District Court for the District of Massachusetts noted: "Practically speaking, there may often be an information imbalance between a plaintiff and a defendant, with the defendant possessing the additional experience and knowledge gained from owning and operating the facility containing the architectural . . . barrier." (*Massachusetts v. E\*Trade Access, Inc., supra*, 464 F.Supp.2d at p. 61.) Such is the case here. In determining whether a plaintiff has introduced prima facie evidence tending to show that removal of an existing architectural barrier is readily achievable, a plaintiff should not be expected to address industry and operational concerns best known by the retailer. Plaintiff made a specific proposal to remove the architectural barrier caused by narrow merchandise pathways by, among other things, rotating merchandise tables, contracting display racks, and removing display rack extensions. Plaintiff should not be required to provide a plan so specific that it fully accommodates industry techniques for highlighting merchandise and Mervyn's specific presentation practices.

This case is unlike *Hermanson, supra*, 264 F.3d at page 1001, which was concerned with renovating a historical building, not rearranging display racks. In *Hermanson*, the plaintiff presented a conceptual "sketch" for a wheelchair ramp into a historical building, with "estimated probable costs" based on

similar projects. (*Id.* at p. 1007.) The court, remarking that it was a "close case," found the evidence insufficient because the plaintiff failed to present any evidence the city would approve modification to the historical building, failed to provide precise costs estimates, and "[p]erhaps most importantly," failed to present a specific design. (*Id.* at p. 1009.) Notably, there was no "information imbalance" (*Massachusetts v. E\*Trade Access, Inc., supra,* 464 F.Supp.2d at p. 61) between the plaintiff and the defendant in *Hermanson.* A plaintiff may obtain specific plans and precise cost estimates for a structural renovation like installation of a wheelchair ramp without owning and operating the facility. But plaintiff here could not estimate the cost of rearranging display racks without operational knowledge such as sales per square foot and the applicable profit margin. The "readily achievable analysis must be done on a case by case basis." (H.R.Rep. No. 101-485 (III), 2d Sess., p. 61 (1990).) In this case, we conclude that plaintiff produced sufficient evidence to satisfy its burden to show that its suggested method of barrier removal was readily achievable.

### 5. *Mervyn's produced substantial evidence that removal of architectural barriers would result in a significant loss of sales, and thus removal is not readily achievable*

"[A] failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable" is discrimination under the ADA. (42 U.S.C. § 12182(b)(2)(A)(iv).) "The term 'readily achievable' means easily accomplishable and able to be carried out without much difficulty or expense." (42 U.S.C. § 12181(9).) "The rearrangement of temporary or movable structures, such as furniture, equipment, and display racks is not readily achievable to the extent that it results in a significant loss of selling or serving space." (28 C.F.R. § 36.304(f) (2007).)

The trial court found that CDR's proposals to remove access barriers by fully implementing Mervyn's spacing guidelines or otherwise reconfiguring merchandise displays would necessitate a loss of selling space. The court found the loss of selling space significant upon crediting Mervyn's evidence that six stores lost $1 million in profit in nine months when the stores adopted 32-inch vertical pathways through merchandise displays. The court also accepted Mervyn's evidence that Mervyn's would suffer annual lost sales of $70 million, and up to $30 million in lost profits, if the same spacing guidelines were implemented in all California stores. The court concluded that the removal of access barriers with "[s]uch a drastic result" of lost sales and profit that would imperil Mervyn's operations "is not, and cannot be deemed, readily achievable."

CDR argues that the six-store study was fundamentally flawed, and the extrapolation of the study results to all Mervyn's stores was wrongly admitted into evidence. Even if the study and extrapolation were properly relied upon, argues CDR, the court erred in failing to consider Mervyn's total financial resources when assessing whether the removal of access barriers is readily achievable. More generally, CDR argues that the evidence is insufficient to support the trial court's finding that respacing Mervyn's merchandise pathways to allow greater access is not readily achievable because respacing would result in a significant loss of selling space.

We review the trial court's factual findings under the deferential substantial evidence standard. " 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court.' " (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427].) Substantial evidence supports the trial court's findings.

As noted earlier, Mervyn's presented the testimony of marketing professor Tyebjee, who conducted a field test of six Mervyn's stores that were respaced with a 32-inch clearance for all vertical pathways between merchandise display units. Tyebjee did not determine the amount of selling space lost by respacing the test stores, but Mervyn's chief financial officer, Clay Creasey, testified that respacing the test stores required removal of about 4 percent of display racks, on average, or roughly 45 to 50 racks per store. Creasey explained that the removal of display racks is the removal, or loss, of selling space. Tyebjee concluded that respacing stores with 32-inch vertical pathway clearance had "an adverse impact on sales at Mervyn's," but he did not quantify the impact. Creasey quantified the lost profit for the six test stores over the course of the nine-month test at approximately $1 million. Creasey calculated that if the test spacing criteria were expanded to all California stores, the result would be approximately $70 million in lost sales and $30 million in lost profit annually.

CDR asserts that "Tyebjee's study was conceptually and methodologically flawed in multiple respects." CDR argues that the test stores were not a representative sample, and that the study failed to state how many racks were removed, failed to evaluate a range of respacing options, and failed to consider if improved displays could compensate for lost selling space. The argument is unavailing. There is substantial evidence that the test stores were

a representative sample. Creasey was asked on cross-examination: "Is it your testimony that the six test stores are representative of all Mervyn's 125 stores? Is that your testimony?" Creasey replied unequivocally: "That's correct, yes." While Creasey acknowledged that each store differs in its "competitive environment" and its mix of merchandise, Creasey was adamant that "there are vastly more similarities than there are differences" among the stores. Likewise, any failure of Tyebjee's study to state the number of display racks removed for the test stores was addressed by Creasey, who testified that "on average the stores lost approximately 4 percent of the racks that the store overall has, and that's roughly 45 to 50 racks per store." On appeal, we do not read a single witness's testimony in isolation but consider the record as a whole. (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336 [95 Cal.Rptr.2d 16].)

CDR's remaining complaints about Tyebjee's study—that the study did not evaluate other respacing options or the possible compensating effect of improved merchandise displays—does nothing to undermine the evidentiary force of the study on appeal in showing an adverse impact on sales from respacing. The study is substantial evidence that respacing resulted in lost sales. CDR's conflicting claim that lost sales can be minimized by respacing only a portion of the stores or improving merchandise displays was weighed, and rejected, at trial. On appeal, we must resolve all conflicting evidence in favor of the fact finder's judgment. (*Bickel v. City of Piedmont, supra*, 16 Cal.4th at p. 1053.)

CDR's challenge to Creasey's testimony on lost profits is likewise unavailing. CDR argues that the trial court erred in relying on Creasey's testimony that Mervyn's lost profit of $1 million from respacing the test stores, and would lose $30 million annually if all California stores were respaced. CDR first argues that the testimony was admitted for a limited purpose (to explain why Mervyn's did not implement spacing guidelines) and not for the truth of whether Mervyn's suffered lost profits from respacing stores. CDR is wrong.

While Creasey's testimony on lost profits was *initially* introduced and admitted for a limited purpose, the evidence was subsequently admitted without limitation. When Creasey was first questioned about lost sales, the court indicated that the witness could testify about management decisions taken in response to the Tyebjee study but could not extrapolate lost profits from the study. The court said that if Mervyn's wished to expand Creasey's testimony beyond the effect of the study on management decisions, "we'll have to have a discussion again." Such a discussion shortly ensued. Creasey

began to testify about the amount of lost sales and profits, and CDR objected on lack of foundation, speculation, and introduction of an undisclosed expert witness. The court asked the parties' attorneys if CDR had notice that Creasey would testify about the study, and Mervyn's said that Creasey had been deposed on the subject. Deposition testimony was read in which Creasey said that Mervyn's extrapolated lost sales from the Tyebjee study. The court overruled CDR's objection to Creasey's testimony, and admitted the evidence without stating any limitation. Creasey's testimony on lost sales was not admitted for a limited purpose.

Nor did the trial court err in overruling CDR's objections. CDR argues on appeal that Creasey's testimony was conclusory and without foundation because he did not explain "how he arrived at his estimated $1 Million in lost profits for the test stores, nor how he got from that figure to his estimated annual, statewide loss of $70 Million in sales, nor how he got from that figure to the $30 Million in lost profits." (Underscoring omitted.) The record is to the contrary. The Tyebjee study reported lost sales by store department. Creasey testified that he totaled the department figures for a storewide average weekly figure of $10,771 in lost sales. Creasey said he then applied a profit margin to the sales figure to calculate lost profits of $1 million on the lost sales reported by Tyebjee for the test stores over a nine-month period. Creasey also explained that he estimated $70 million in lost sales if all California stores were respaced like the test stores. This explanation is well founded: $10,771 in weekly lost sales, multiplied by 52 weeks and 125 California stores, equals approximately $70 million. Creasey also testified that $70 million in lost sales equates to $30 million in lost profits for Mervyn's. As the record shows, Creasey did explain his calculations. While his explanation was not highly detailed, it was sufficient.

We also reject CDR's contention that Creasey's calculations and extrapolations from the Tyebjee study were beyond Creasey's knowledge and capabilities. Creasey is the chief financial officer of a major corporation. He has both a bachelor's degree in statistics and a master's degree in business administration from Stanford University. Creasey initiated, planned, and participated in the study, and testified that he fully understood the study and its results. CDR insists that no legitimate extrapolation of lost sales was possible and that "Mervyn's was erroneously allowed to use Mr. Creasey to do what Prof. Tyebjee could not and did not do—quantify lost sales, project lost profits and extrapolate from six test stores to 125 stores statewide." But Tyebjee never testified that such calculations were impossible. He simply said

that he did not receive profit margin information and was not asked to extrapolate his study to Mervyn's stores statewide. Far from saying that a statewide extrapolation was impossible, Tyebjee testified: "I think there's enough substance to the estimates I have in my results which could be used to make that projection by somebody who had knowledge about the differences and similarities with various Mervyn's stores." There is substantial evidence that Creasey, as Mervyn's chief financial officer, had the knowledge necessary to project lost sales statewide.

Finally, CDR argues that $70 million in annual lost sales is insignificant when the overall financial resources of Mervyn's and its parent corporation at the time, Target, are considered. CDR's narrow focus on Target's assets ignores broader considerations relevant to assessing whether the removal of an access barrier is readily achievable. As noted earlier, "[t]he term 'readily achievable' means easily accomplishable and able to be carried out *without much* difficulty or *expense*." (42 U.S.C. § 12181(9), italics added.) Congress understood the readily achievable standard to be a "modest requirement," that would not be burdensome to those providing public accommodations: "if barrier-removal cannot be accomplished readily, then it is not required." (H.R.Rep. No. 101-485 (II), 2d Sess., p. 109 (1990).) A number of factors are relevant to determining whether an action is readily achievable, of which the overall financial resources of the defendant is just one. (*Ibid.*) Other relevant factors include "the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility." (42 U.S.C. § 12181(9)(B).)

Mervyn's presented substantial evidence that lost sales of $70 million annually would have a drastic negative impact upon its operations. In rendering its judgment, the trial court relied upon evidence that "Mervyn's sales trends have been declining over the years, and have put the company in a difficult financial position"; "Mervyn's is already underperforming in sales with competitors such as Kohl's"; and "a policy resulting in millions of dollars in annual lost profits would put Mervyn's out of business." The trial court reasonably concluded that an action cannot be considered readily achievable if it would drive a corporation out of business.

### 6. *There is insufficient evidence that Mervyn's made its facilities available through alternative methods*

■ A retailer's obligation to provide access to the disabled is not limited to the readily achievable removal of physical barriers. Where removal of physical barriers is not readily achievable, a retailer must adopt alternative methods for providing full and equal access to its goods and services. (42 U.S.C. § 12182(b)(2)(A)(v).) The ADA expressly provides: "[W]here an entity can demonstrate that the removal of a barrier . . . is not readily

achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods" is actionable discrimination, "if such methods are readily achievable." (42 U.S.C. § 12182(b)(2)(A)(v).)

On this subject, a congressional committee remarked that, if a retail "store could demonstrate that raising, lowering, or removing shelves would not be readily achievable, then the store must consider providing access through alternative methods. For example, a clerk could retrieve merchandise from inaccessible shelves, unless this alternative method is not readily achievable." (H.R.Rep. No. 101-485 (III), 2d Sess., p. 62 (1990).) It was also observed that a retail department store need not "separate each and every display fixture in order to provide wheelchair clearance maneuverability. It is sufficient if a customer who uses a wheelchair is able to determine, once in a department, that the store offers, for example, black leather jackets. Once that is determined, the customer can rely upon a salesperson to retrieve a black leather jacket in the customer's size." (H.R.Rep. No. 101-485 (II), 2d Sess., p. 110 (1990).)

At trial, Mervyn's claimed that it provided adequate customer service to assist disabled individuals in gaining access to merchandise that could not be physically reached through the sometimes narrow merchandise pathways. The trial court rejected the claim. The court concluded that "Mervyn's customer service is not always effective to help disabled customers gain access to inaccessible merchandise. The evidence indicates that no one in particular is assigned to assist persons with disabilities and sales clerks are generally available to assist shoppers only when they are not checking out customers at the cash registers." Moreover, "[t]he testimony of witnesses who regularly shopped at Mervyn's establishes that they were sometimes unable to view, retrieve, or purchase merchandise they were interested in buying because after being unable to gain physical access to merchandise, shoppers encountered Mervyn's employees who were unavailable or unwilling to provide adequate assistance."

The trial court nevertheless found that Mervyn's satisfied its obligation to provide access by alternative means. The court concluded that Mervyn's "proved that it is taking readily achievable steps to remove any barriers that may exist at its stores. Mervyn's designs its new stores to provide access within the merchandise pads, as evidenced by the new store in Folsom, which

has vertical pathways in all departments in excess of 36 inches. In remodeling older stores, Mervyn's explicitly considers access issues and improves access within the pads." In its briefing on appeal, Mervyn's abandons its previous claim that adequate access is provided by customer service (a claim the trial court rejected) and embraces the trial court's conclusion that access to Mervyn's new and remodeled stores excuses the lack of access to its existing stores.

We cannot accept the trial court's conclusion. The average age of a Mervyn's store is 17.5 years. The trial court's statement of decision, issued in 2004, observes that only two new stores have been opened since 1996 or 1997—the Folsom store and another in Las Vegas, Nevada. The trial court also noted that Mervyn's has remodeled some older stores, including a Bakersfield store that was designed with narrower display racks. However, Mervyn's does not require that any of its stores—including the new and remodeled stores—provide sufficient clearance for those using wheelchairs or other mobility aids. Mervyn's has also failed to point to any evidence that these newer, assertedly more accessible stores are sufficiently near its existing stores to provide alternative access to disabled individuals. Mervyn's does not satisfy its obligation to make its merchandise accessible to a disabled shopper at its Cupertino store by constructing a new store 150 miles away in Folsom.

As we noted earlier, Congress adopted two distinct standards for regulating building accessibility: one to apply to facilities existing before January 26, 1993, and the other to apply to facilities newly constructed or altered on or after January 26, 1993. (42 U.S.C. §§ 12182(b)(2)(A)(iv), 12183(a).) Under the ADA, "existing facilities" must remove architectural barriers "where such removal is readily achievable," meaning "easily accomplishable and able to be carried out without much difficulty or expense." (42 U.S.C. §§ 12182(b)(2)(A)(iv), 12181(9).) If removal of architectural barriers from an existing facility is not readily achievable, the facility must make its goods and services available to disabled individuals through "alternative methods if such methods are readily achievable." (42 U.S.C. § 12182(b)(2)(A)(v).) In contrast, new and altered facilities must be "readily accessible . . . and usable," and must comply with extensive and detailed regulations. (42 U.S.C. § 12183(a); 28 C.F.R. § 36, appen. A (2007).) The parties are agreed that this appeal concerns stores constructed before 1993, which are "existing facilities" within the meaning of the ADA. Nothing in the ADA suggests that a corporate chain of department stores satisfies its obligation to make existing facilities accessible (to the extent readily achievable) by constructing new and geographically distant facilities that are accessible.

At oral argument, Mervyn's counsel conceded that the construction of new stores is not a reasonable alternative to removing access barriers at existing stores, at least for existing stores that are geographically remote from the new stores' locations. Counsel suggested that customer service provides some relief to disabled shoppers denied access to merchandise. But, as noted above, the trial court found Mervyn's customer service inadequate for this purpose—a finding uncontested in Mervyn's brief to this court.

We conclude that there is insufficient evidence to support the trial court's finding that Mervyn's made its merchandise available through alternative methods to disabled individuals who were denied physical access. Mervyn's failure to provide access by alternative methods constitutes a violation of the ADA, and thus a violation of both the Act and the DPA. (42 U.S.C. § 12182(b)(2)(A)(v); Civ. Code, §§ 51, subd. (f), 54, subd. (c).) Mervyn's violation of federal and state law is also a violation of the UCL, which defines unfair competition to include any unlawful business act or practice. (§ 17200.) Accordingly, we reverse the judgment in favor of Mervyn's and remand the case to the trial court for further proceedings.

## C.  *Proceedings on remand*

CDR says it is entitled to immediate entry of judgment in its favor on remand, followed by a determination of the appropriate scope of injunctive relief. Mervyn's argues that judgment cannot be entered for CDR because CDR lacks standing to maintain this action in the trial court. Mervyn's is correct.

As discussed above, CDR lost standing as a plaintiff when the voters adopted Proposition 64, which amended the UCL to limit private party lawsuits to those who have lost money or property as a result of alleged unfair competition. (*Mervyn's, supra*, 39 Cal.4th at p. 227.) We therefore cannot remand the case with directions to enter judgment in CDR's favor. However, CDR is entitled to an opportunity to amend its complaint to substitute a new plaintiff with standing. (*Branick, supra*, 39 Cal.4th at pp. 239, 242–243.) We therefore remand the case to the trial court so that CDR may file a motion for leave to amend its complaint. "On remand, should plaintiff[] in fact file a motion to amend, the superior court should decide the motion by applying the established rules governing leave to amend . . . ." (*Id.* at p. 239, citing Code Civ. Proc., § 473.) If the court grants the motion, the court shall enter judgment in favor of the newly substituted plaintiff and determine the appropriate scope of injunctive relief. In fashioning injunctive relief, the court shall consider appropriate alternative means for making merchandise available to disabled individuals who are denied physical access to the merchandise.

## IV. DISPOSITION

The judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion. Appellant CDR shall recover its costs on appeal upon timely application in the trial court. (Cal. Rules of Court, rule 8.278.)

Ruvolo, P. J., and Reardon, J., concurred.